CRAWFORD TRANSPORT CO., a Corporation, Plaintiff,

v.

CHRYSLER CORPORATION, a Corporation, and Commercial Carriers, Inc., a Corporation, Defendants.

No. 497.

United States District Court
E. D. Kentucky,
Catlettsburg Division.

Jan. 18, 1962.

Findings of Fact and Conclusions of Law

Nov. 5, 1962.

752

See also D.C., 191 F.Supp. 223.

Stoll, Keenon & Park, Lexington, Ky., John McKenzie, Ashland, Ky., for plaintiff.

Caldwell & Robinson, Ashland, Ky., Kelley, Drye, Newhall & McGinnis, New York City, Howard & Francis, Prestonsburg, Ky., for defendants.

SWINFORD, Chief Judge.

In the first place I want to review briefly, if I may, the background of this litigation. The plaintiff, the Crawford Transport Company, has been in business since 1931. During that time its principal patron was Chrysler Corporation and Chrysler Motors. It was a common carrier with rights which it has acquired over some five states, including part of Kentucky, West Virginia, North Carolina, Georgia, and possibly one other—I don't know whether Florida is included in that or not.

"MR. PARK: No, sir.

"THE COURT: It is not. And it has established itself as a trustworthy and dependable carrier. That fact is attested by the defendant Chrysler Corporation, itself, its officers who have suggested both by their words and their actions that Chrysler placed implicit confidence in the ability of this plaintiff to discharge the duty of expeditiously and reasonably transporting the products from manufacturer to dealer. That is a condition, however, which existed with a number of other carriers, and it reached the place where there were about 83 carriers, I believe at one time, transporting Chrysler products as common carriers."

We must recognize, of course, that in the automobile industry, like in other widely covered fields in our economic life, there has been a considerable change in methods. Chrysler had 6,000 dealers, at one time possibly more, but so far as our case goes here, 6,000 scattered from the East Coast to the West Coast, and from the Great Lakes to the Gulf, and it used these 83 carriers to transport its products. Since February of 1952, the contractual arrangement between Chrysler and its dealers was that Chrysler would

ship the product to the dealer and that Chrysler would have the right to say who would carry the automobile. In 1954 that right was reasserted and reestablished and while these dealers were recognized as to their wishes and desires, as to what carrier would be used, that I believe was only persuasive and not conclusive of the agreement between the dealer and the manufacturer. That is, it seems to me, only a reasonable proposition. Transportation of an automobile is a part of the sale of an automobile. To send an automobile to where it is going to be sold, attractively presented and in its best form at the end of a 2,000-mile or 200-mile or 50-mile journey, is just as much a part of having that automobile presentable to the public and acceptable to the public as it is when it first comes off the assembly line at the plant. And so it seems to me that it would be unreasonable to say that a manufacturer whose investment was in that car could not have the right to say who was going to haul it. And while the car was owned by the dealer from the time it was delivered to the carrier, it was with his consent and by his agreement that that carrier was selected because he had agreed when he went into his agency agreement with Chrysler that he would let Chrysler choose the transportation method. Evidently, according to the evidence here, there were a number of variances in that. Some of these dealers hauled their own cars, with the consent of the manufacturer; some of them drove the cars through at one time, within a certain radius. But there seems to have been no definite pattern and there was never apparently any controversy between the manufacturer and the dealer about this arrangement.

Chrysler found that in order to sell its cars most advantageously and to serve the public as it thought better and get rid of the automobiles for a consideration, it should adopt a method which had been in vogue for some time with its two chief competitors, Ford and General Motors. It reduced the number of carriers from 79 as it was at that time, to 16. General Motors, had 14 and Ford, 16, or vice versa. Chrysler called into its office, these 79 carriers on May the 17th, 1957, and gave this demonstration to all of these carriers and gave the reason why it wanted to make this reduction, not that it was making any change in the selection of the carriers, because it had had that prerogative since 1952, but that it was reducing the number of carriers and explaining to them what they might to do be retained as carriers. That meeting of May 17th, 1957, didn't happen spontaneously. It took some planning, it took some discussion. I think the discussion started back in '56 between the executives of Chrysler Motors. They may even have had discussion with their co-defendant. There is no great proof that any intrigue was going on, but it undoubtedly was a matter which required a considerable planning and effort to get up to the point where they could make this demonstration on May the 17th, 1957. Now, a business that makes plans and discusses its program doesn't necessarily lay itself liable to committing a law violation. Much of the documentary evidence that is offered is in the form of letters and correspondence. The whole thing was revealed to all of these carriers on the 17th of May. No protest was made as far as the record goes. On July the 2nd, Mr. Van Beckum wrote that he was not satisfied at all with the arrangement that Chrysler had in mind. Mr. Laughna wrote back the "football letter", in which he stated that Mr. Van Beckum's corporation was supposed to be one of his best players on the team, he didn't think they could win when their best player was dissatisfied, or something to that effect, but that doesn't necessarily commit either of them to intrigue.

And so, to summarize briefly, you have after the meeting of May the 17th, 1957, some correspondence back and forth between various agencies and offices and the formation of what is identified as Southern Transport Company, in which the plaintiff, Crawford Transport, was given 19% of the stock and an executive

office. The Court is not in a position to say just what happened to Southern, except that it was not successful. There are implications that there was an inner group of control in the hands of those who sought to eliminate others or to bring about a different program. Evidently it was badly managed some place along the line. And so the defendant Commercial Carriers and others then proceeded to transport these automobiles through these areas, to 6,000 dealers all over the country.

That, briefly, I believe is the substance of the facts. The Sherman Act, Section No. 1, which provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal:"

■ I am asked to find that what went on was an illegal arrangement between Commercial Carriers, Chrysler Motors and Chrysler Corporation. The evidence just does not go that far, gentlemen. The burden of proof on the facts alone is not sustained, any more than you might sustain a finding of conspiracy and restraint in numerous business connections in this country. To hold under these facts, admitting for the sake of discussion, that these people have committed a crime by what they have done in trying to reduce the cost of their operation would be to subject, I am afraid, numerous corporate enterprises or individual business establishments to serious consideration. The defendant, Chrysler, according to the statement of counsel, did not make this change to make money, but made it to keep from losing money. The transportation system that it had, had proven very unsatisfactory and was leading it to serious financial stress in that department; some millions of dollars, according to statement of counsel, had been lost by the methods which it had been following. And so it is difficult for me to say that a business house, irrespective of how large or how small, seeks to establish a new system or new plan to keep from losing

money, is thereby doing something in restraint of trade to make money and to enrich itself unjustly at the expense of either some other business enterprise or the public. I can't find it is in the spirit of the Sherman law.

As far as Commercial Carriers is concerned, I can't see that it has done anything wrong. There has been some correspondence, of course, but to hold that it has been guilty of crime by just these few letters that are brought here, and that is all we have of any real consequence, for the Court to say that it has been guilty of crime against the public and against the plaintiff, you are asking for a credulity which this Court doesn't have. All it did was try to get business, just like Crawford was trying to get business.

As far as Motors is concerned, Motors was not created until the fall of 1956 and whatever arrangement there was between Chrysler and its dealers had been going on for some months at least, since February of 1956, and as a matter of fact, the general understanding for several years. I can't see that Motors figuring in here has any great significance. To me there is a significant distinction between this case and the General Motors Acceptance Corporation case in 121 F.2d 376. That was a joint enterprise for the purpose of making money.

■ The defendant, has got to be proven guilty of a crime by a preponderance of the evidence. Plaintiff must sustain the burden. The great mass of testimony offered here, both from the witness stand and from the depositions brings into the record the numerous instances of communications from the program that Chrysler had, the program that Commercial Carriers had, the plan, the program that Motors had, but that is not of sufficient dignity to prove to a court of equity that any carrier who is offended by having his business taken away from him, because of a change in transportation facilities and transportation program of a corporation, is entitled to triple damages. The burden which the plaintiff must sustain is a real

burden. It is not just something inconsequential. To sustain such a rule of law, would upset I believe much of the business in this country with reference to transportation. That a man engaged as a transporter has staked a claim with a manufacturer and he and not his employer is going to determine who is going to do its transportation business, irrespective of how unqualified the transporter may be or may become. That would place the burden upon the shipper to show that the transporter is not qualified to handle the product. And to lay down as a rule of law that the transportation company gets a prescriptive right, so to speak, in a line of business, would require more interpretation of the antitrust laws than we can find in these books.

The first thing we should consider from the standpoint of the case is the tie-in proposition. There is not a tie-in here between Chrysler and Motors and Commercial Carriers such as the tie-in between General Motors and General Motors Acceptance Corporation (121 Fed. (2) 376). There is not a tie-in here to control commerce. As I said at the outset, the business of this defendant Chrysler is to sell automobiles and to get them delivered in an attractive form so they will induce the public to buy them and what happens to them on the road is just as important as what happens to them in the assembly plant. They could bring out the most beautiful Imperial in the history of the industry and if it were not properly handled by a transportation company, speedily and properly, all that had gone into the making of that car would be lost. But it can't be said to be a tie-in, because a manufacturer is interested in who is going to carry his product to the market. That is an accepted business practice. Otherwise there would be no point in any of these agreements between the manufacturer and the dealer. So it is just as vital to Chrysler to have that car delivered in the proper way as it is to see that it is properly put together or that it is properly made, and to say that it

doesn't have the right to do that and if it attempts to do it, tries to select the carrier, it has engaged in an unlawful enterprise, seems to be contrary to the reasonable conception of almost, if not altogether, universal business practices.

There is the question of allocation of territory. That is answered in the fact that Chrysler didn't allocate any territory, neither did Commercial Carriers. The territory was agreed upon by those who had been using it and one of those who had been using it was Southern Transport of which the plaintiff was a part. They allocated it to themselves and they accepted it and they told Chrysler, "We will take care of all these states." That is in the correspondence. It wasn't Chrysler that allocated it, it wasn't Commercial Carriers, it wasn't any unlawful combine that allocated it. It was an arrangement between sensible, reasonable businessmen. These are not children, but mature men experienced in business of this character, and they went into what they thought was a good thing. It may not have been what they would have liked, but it was the best thing under the circumstances and they allocated the territory among themselves. Simply because some of them did not successfully carry on the enterprise or the transportation company that was launched cannot be said to prove a crime on the part of these defendants.

There is also a question raised by counsel of a concerted refusal to deal. I listened very attentively to Mr. Downing's argument on that point and I can't find that there is any evidence to sustain that claim, unless I say that the evidence proves by a preponderance that a shipper who chooses one carrier over another, all of whom are seeking his business, commits a crime if he doesn't divide it. There is no concerted effort here. I don't find anything in this proof to sustain to the degree which the law requires that these people went together and just said, "Let us turn our back on the plaintiff, let us not have anything to do with Crawford." As a matter of fact, they sought to have something to do with

Crawford. They contracted with him, they agreed with him and went on and said, "Yes, you can haul our products and continue to do it and we will give you the job," encouraged it—and which was not difficult for Crawford to do, Crawford was well equipped to do what they wanted him to do and he was meeting more or less his standard of transportation business that he had practiced all those years. But in order to reduce the number—that is the whole thing—could they or could they not reduce the number of carriers? In order to do that, he said, "We and some six or eight others will go into a separate corporation and we will still carry your business just as we have done before."

But the plaintiff is asking me to say here today that Chrysler still has to do business with 79 different carriers. That would be the judgment of this Court, if I sustained the prayer of the complaint, that you can never get rid of a common carrier if you once do business with him. I can't find damages, without saying that Chrysler has to keep its 79 carriers. And not only that, if this carrier is successful here, there will be 79 others suing Chrysler for the same thing and if they are ordered to resume their practice of having 79 carriers, then they will also owe them everything they have lost since 1958 or maybe since 1957, when they first brought out the 1958 model.

Now, they also talked about the recommendations to these carriers that they hold down the rates. They seem to deduce from that that that was a serious offense or a serious show of crime, wrongdoing. That is no more than shop talk, that is just common sense, that when you are hiring somebody to do something for you, you say, "Hold down the costs as much as you can." It certainly isn't any combine to cut out other transportation carriers.

They also raise the question of the use of Dodge trucks as being an element or a circumstance which should be considered as evidence to establish the wrong. I don't believe that that could be very seriously argued that giving someone a substantial contract, to ask them at least or to suggest to them rather forcibly, if you will, that, "If you are going to sell shoes, we don't want you to go barefooted." "If you are advocating this product, it looks like you ought to be using it." There is no wrong in recommending and asking. It didn't affect Crawford anyway because Crawford used Dodge trucks, I think almost a hundred per cent in hauling Chrysler products.

In order to find Chrysler liable under Section 1, it would be necessary to find that it conspired with either its co-defendant, Commercial Carriers, or with its subsidiary, Motors. By reviewing what I have here and said what I have with reference to evidence in the case, I don't think that you have made out a case against any of the defendants under Section 1, either in law or in fact.

Section 2 of the Sherman Act makes it unlawful to create or to monopolize in restraint of trade or commerce, any industrial operation. Chrysler could be guilty of that alone without any collaboration on the part of anyone. I don't think that you have made out a case against Chrysler alone, under Section 2 of the Sherman Act, either in law or in fact.

I have not attempted to refer to all of the evidence, of course. I have not referred to any cases. I feel that what I have said is sustained by the record and by the decided cases of the federal courts and primarily, of course, the Supreme Court in its interpretation of the Sherman law.

I should have said this possibly at the outset, that it might be considered by an appellate court as having been a better practice, a more approved practice, had I overruled this motion and let the defendant offer its case and I am not inclined to disagree with that under ordinary circumstances, but I believe that it is the duty of the court when it is convinced of the correctness of a decision, to make it at the time and not to look to an expedient. This litigation is expensive on these plaintiffs, it is expensive on the defendants, and I feel that

there is sufficient record here on which to draw the deductions both in law and from the evidence to sustain my decision.

## FINDINGS OF FACT

1. Plaintiff Crawford Transport Company, Incorporated (hereinafter called "Crawford") is a corporation duly organized and existing under and by virtue of the laws of the state of West Virginia, with its principal place of business at Ashland, Kentucky. It is a common carrier by motor vehicle certificated by the Interstate Commerce Commission, with rights, among others, to transport in interstate commerce new automobiles, new trucks and new automobile and truck chassis in initial movements from points in and near Detroit, Michigan to points in Ohio, Kentucky, West Virginia and North Carolina. Crawford and its predecessors in interest have been engaged in the automobile carrier business since 1931. Its principal customer has been Chrysler Corporation.

2. Defendant Chrysler Corporation (hereinafter called "Chrysler") is a corporation duly organized and existing under and by virtue of the laws of the state of Delaware with its principal place of business at Detroit, Michigan. It is engaged in the business of manufacturing and assembling at and near Detroit, Michigan, various products, including principally new automobiles and trucks and new automobile and truck chassis, which products are transported by common carriers by rail, boat, truck and combinations thereof to dealers in Chrysler products throughout the country for ultimate sale to the public.

3. Defendant Commercial Carriers, Inc. (hereinafter called "Commercial") is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business at Romulus, Michigan. It is a wholly-owned subsidiary of American Commercial Barge Line Company, a publicly held Delaware corporation engaged in business as a water carrier on the inland water ways of the United States. It is a common carrier certificated by the Interstate Commerce Commission. In May, 1957, Commercial's operating authority included authority to make initial movements of new automobiles, new trucks and new automobile and truck chassis from points in and near Detroit, Michigan, to seventeen states, primarily in the south, and parts of two other states. At that time, and to the present, Commercial was and has been a motor carrier authorized by the Interstate Commerce Commission to make direct line shipments of motor vehicles from Detroit, Michigan, to Alabama, Mississippi, Tennessee, Louisiana, Arkansas, Kentucky and Georgia. Its principal customers have been Chrysler and the Cadillac Division of General Motors Corporation.

4. For many years prior to November 1, 1956, Chrysler sold its vehicles to approximately 6,000 dealers in its products throughout the United States with each of whom Chrysler entered into a direct sales agreement. On and after February, 1952, the direct sales agreement with each dealer contained provisions which permitted Chrysler to ship its vehicles to the dealer freight prepaid, and by whatever means of transportation and carrier Chrysler might select. The direct sales agreement also provided that the vehicles be paid for in full by the dealer before shipment and that title to the vehicles remained in Chrysler until paid for in full. Though the direct sales agreement from 1952 to date has been modified from time to time, the substance of these provisions has not been changed except that in 1957 the direct sales agreement also expressly provided for the passing of title to the dealer upon delivery of the vehicle to the dealer, the dealer's agent, or the carrier.

5. Prior to November, 1954, Chrysler did not exercise the right reserved to it in the direct sales agreement to select the means of transportation and carrier for the delivery of its vehicles to its dealers nor did it exercise its right to prepay the freight thereon. Prior to November, 1954, Chrysler permitted its dealers to make their own arrangements for the transportation of the vehicles from the

factory to the dealer's place of business and to pay directly whatever freight charges were involved.

6. In November, 1954, Chrysler put into effect a policy under which it exercised its right under its sales agreements to select the method by which its vehicles would be transported to its dealers, to select the common carriers to be used to transport the vehicles and to prepay the freight charged by the common carriers. The dealers thereupon ceased making their own arrangements with the carriers for the transportation of the vehicles. Under this policy Chrysler, however, followed a practice of honoring requests from its dealers, when not inconsistent with operational efficiency, as to the mode of transportation and the particular carrier to be used, with the result that carriers solicited Chrysler business not only from Chrysler direct but indirectly through its dealers as well.

7. There is no evidence that Chrysler exercised its contractual right to select the method by which its vehicles would be transported to its dealers, to select the common carriers to be used to transport the vehicles and to prepay the freight charged by the common carriers either in an attempt to monopolize the business of transporting new motor vehicles in interstate commerce or as a result of or pursuant to any contract, combination, agreement, understanding or conspiracy with Commercial or any other carrier, or anyone else.

8. Chrysler did not combine, conspire or enter into any contract, agreement, understanding or concert of action with Commercial or any other carrier or with anyone else to exercise its contractual right to select the method by which its vehicles would be transported to its dealers, to select the common carriers to be used to transport the vehicles and to prepay the freight charged by the common carriers.

9. There is no evidence that Chrysler's exercising its contractual right to select the method by which its vehicles would be transported to its dealers, to select the common carriers to be used to transport the vehicles and to prepay the freight charged by the common carriers unreasonably restrained trade in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to any other point in the United States.

10. Chrysler's exercise of its contractual right to select the method by which its vehicles would be transported to its dealers, to select the common carriers to be used to transport the vehicles and to prepay the freight charged by the common carriers did not unreasonably restrain trade in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to any other point in the United States and Chrysler did not thereby attempt to monopolize such trade.

11. In the period from November, 1954, to February, 1956, Chrysler charged its dealers the actual freight costs incurred in the transportation of vehicles. In February, 1956, Chrysler instituted and thereafter continued in effect a destination charge program.

12. There is no evidence that Chrysler contrary to law instituted or carried on its destination charge program either in an attempt to monopolize the business of transporting new motor vehicles in interstate commerce or as a result of or pursuant to any contract, combination, agreement, understanding or conspiracy with Commercial or any other carrier or with anyone else.

13. Chrysler did not unlawfully combine or conspire or enter into any agreement, understanding or concert of action with Commercial or any other carrier or with anyone else to institute or carry out its destination charge program.

14. There is no evidence that Chrysler's instituting or carrying out its destination charge program unreasonably restrained trade in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to any other point in the United States.

15. Chrysler's instituting and carrying out its destination charge program did not unreasonably restrain trade in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to any other point in the United States and Chrysler did not thereby attempt to monopolize such trade.

16. In September, 1956, Chrysler Motors Corporation (hereinafter called "Motors") was organized and incorporated as a wholly-owned sales and marketing subsidiary of Chrysler under the laws of the state of Delaware and commenced its operations on or about November 1, 1956. On or about November 1, 1956, Chrysler entered into an agreement with Motors under which Chrysler assigned to Motors all its direct sales agreements with dealers throughout the United States and agreed to sell to Motors and to deliver to Motors' dealers all vehicles produced for domestic retail sale.

17. Under the agreement with Motors, Chrysler retained the right to prepay the freight on vehicles sold to Motors and shipped to Motors' dealers and to select the means of transportation and the carrier. Thereafter, Chrysler continued to exercise exclusive control over the transportation of its products to dealers. Motors never shipped to its dealers the new motor vehicles it sold to them.

18. Plaintiff does not allege, nor is there any evidence, that Chrysler's policies with respect to its direct sales agreements with its dealers or with respect to the exercise by Chrysler of the rights reserved to it under these agreements as described in findings 4, 5, 6 and 11, or that Chrysler's arrangements with Motors as described in findings 16 and 17, were adopted by Chrysler, or were followed by it prior to its adoption of the carrier retention program, as a result of or pursuant to any contract, combination, agreement, understanding or conspiracy with Commercial.

19. Chrysler is not engaged in the business of transporting new vehicles in interstate commerce. Chrysler ships its vehicles to approximately 6,000 dealers located throughout the United States by common carriers by rail, boat, truck and combinations thereof. Since at least November, 1954, and up to September, 1957, the great bulk of such shipments have been by common carriers by motor vehicle, including plaintiff Crawford, as such, and defendant Commercial. These common carriers are certificated by the Interstate Commerce Commission under Certificates of Public Convenience and Necessity with rights to engage in interstate transportation of new motor vehicles by truck from certain specified points of origin to certain specified points of destination. Many of these common carriers, including plaintiff Crawford and defendant Commercial, participate in the agency tariffs published by the National Automobile Transporters Association, an association of automobile carriers. Such rates are filed with and approved by the Interstate Commerce Commission and are the rates charged to any automobile shipper for the transportation of its products.

20. In 1955 Chrysler's Director of Traffic commenced a study and analysis of Chrysler's transportation practices to determine whether any changes therein would result in a more efficient and economical distribution of Chrysler's products. In a preliminary proposal entitled "A Suggested Plan for the Reduction of the Number of Trucking Companies Serving Chrysler Corporation in the Middle West", dated September 21, 1956, the Director of Traffic recommended that Chrysler reduce from 35 to 3 the number of common carriers by motor vehicle to whom it tendered traffic into the states of Wisconsin, Iowa, Missouri, Illinois, Indiana, Michigan, Ohio, West Virginia, and the western portions of New York, Pennsylvania and Maryland. The proposal also recommended that a similar carrier reduction plan be put into effect in the remainder of the United States as soon as possible.

21. In a second and more comprehensive proposal entitled "Outbound Transportation, Automobiles—Trucks", dated November 21, 1956, Chrysler's Director

of Traffic presented a detailed recommendation that Chrysler reduce from 83 to no more than 20 the number of common carriers by motor vehicle to whom it tendered traffic into all parts of the United States. His proposal contained an analysis of the transportation problems created by Chrysler's current use of a large number of motor carriers varying greatly in size and in the scope of their certificated rights and noted the competitive advantages enjoyed by General Motors Corporation and Ford Motor Company through their using only 14 and 16 motor carriers, respectively. The proposal also contained a recommendation as to the particular motor carriers that Chrysler should continue to use and included plaintiff Crawford among them.

22. In preparing his proposals of September 21, 1956, Chrysler's Director of Traffic discussed with many of the motor carriers then serving Chrysler the improvements that Chrysler could anticipate in the distribution of its products through reducing the number of carriers to whom it tendered its traffic and the possibility that such a reduction would result in lower operating costs for the selected carriers and thus ultimately result in savings in freight costs to Chrysler. These discussions constituted proper attempts by responsible Chrysler executives to obtain information relating to the formulation of Chrysler's transportation policies which could only be obtained from the carriers then serving Chrysler. There is no evidence that any of the carriers, including Commercial, with whom these discussions were held had any part in the formulation of the proposal of September 21, 1956 or the subsequent proposal of November 21, 1956 other than to supply the information requested of them.

23. On January 9, 1957, the Group Executive at Chrysler, to whom the Director of Traffic reported, presented to Chrysler's Administrative Committee, a high policy making body, a proposal that Chrysler reduce to 16 the number of motor carriers to whom Chrysler tendered traffic and that the Central Traffic Department be authorized to select the motor carriers to be retained on the basis of past performance, growth potential, financial stability, freedom from competitive alliances and adequacy of certificated rights. The proposal to the Administrative Committee further recommended the absorption of the unstable carriers by others capable of and willing to absorb. The Administrative Committee approved the proposal.

24. There is no evidence that Chrysler undertook its program to reduce the number of motor carriers to whom it tendered traffic by reason of or pursuant to any unlawful contract, combination, agreement, understanding or conspiracy with defendant Commercial or with any other individual or corporation.

25. Chrysler's decision to reduce the number of motor carriers to whom it tendered traffic was a unilateral one made by it for the sole purpose of obtaining a more efficient and economical distribution of its products and was not made as a part of or pursuant to any unlawful contract, combination, agreement, understanding or conspiracy with defendant Commercial or with any other individual or corporation.

26. There is no evidence that Chrysler undertook its program to reduce the number of motor carriers to whom it tendered traffic in an attempt to monopolize trade in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to any other point in the United States.

27. Chrysler's decision to reduce the number of motor carriers to whom it tendered traffic was not made in an attempt to monopolize trade in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to any other point in the United States.

28. On May 17, 1957 Chrysler held a meeting in Detroit, Michigan, which was attended by representatives of common carriers then transporting Chrysler vehicles from Detroit and at which Chrysler announced that it intended to reduce

the number of common carriers to which it tendered traffic. At this meeting Chrysler presented in detail the proposed changes in its traffic policy and the reasons therefor, and described the five criteria approved by Chrysler's Administrative Committee, upon which each carrier then serving Chrysler would be evaluated to determine whether or not it would be a "retained" or a "non-retained" carrier under the new program. Chrysler also announced that individual discussions in connection with this program would be held with representatives of each carrier at which time each carrier would be advised whether Chrysler would continue to tender traffic to it commencing with the shipment of the 1958 model automobiles in September of 1957.

29. On or about June 20, 1957 Chrysler notified plaintiff Crawford that Chrysler would no longer tender traffic to it commencing with the shipment of 1958 model vehicles. From May 17, 1957 to July 17, 1957 approximately 50 other common carriers were similarly notified by Chrysler. On or about June 27, 1957 Chrysler notified defendant Commercial that Chrysler would continue to tender traffic to it. Approximately 15 other common carriers were similarly notified by Chrysler.

30. At the meeting between representatives of Chrysler and Commercial at which Commercial was notified that it would continue to receive traffic from Chrysler, the Chrysler representatives indicated in general terms the volume of Chrysler traffic which Commercial might expect to receive during shipment of Chrysler's 1958 models. Commercial was disappointed in this indicated volume of traffic and attempted by letter, apparently unsuccessfully, to persuade Chrysler to increase its proposed allocation of traffic to Commercial. This letter, and the other discussions between Commercial and Chrysler as to which any evidence was introduced, constituted nothing more than attempts by a single carrier, acting unilaterally, to compete with other carriers with duplicating operating rights

by solicitation of additional business from a shipper.

31. There is no evidence of any concerted action by Commercial with any other carrier, "retained" or "non-retained" with respect to Chrysler's adoption of its program to reduce the number of carriers to whom it would tender traffic, the selection by Chrysler of the carriers to whom Chrysler would continue to tender traffic or the allocation by Chrysler of its traffic to the carriers serving it, nor is there any evidence to support a finding of any horizontal contract, combination, agreement, understanding or conspiracy between Commercial or any other carrier "retained" or "non-retained" with respect to the adoption or implementation by Chrysler of its carrier reduction program.

32. There is no evidence that Chrysler's decision to no longer tender traffic to Crawford and other "non-retained" carriers and to continue to tender traffic to Commercial and certain other "retained" carriers was the result of or pursuant to any contract, combination, agreement, understanding or conspiracy with Commercial or other "retained" carriers, or Motors or any other individual or corporation.

33. Chrysler's decision to no longer tender traffic to Crawford and other "non-retained" carriers and to continue to tender traffic to Commercial and certain other "retained" carriers was a unilateral one, made by it for the sole purpose of obtaining a more efficient and economical distribution of its products and was not made as a part of or pursuant to any contract, combination, agreement, understanding or conspiracy with Commercial or other "retained" carriers or Motors or any other individual or corporation.

34. There is no evidence that the purpose or effect of Chrysler's decision to no longer tender traffic to Crawford and other "non-retained" carriers and to continue to tender traffic to Commercial and certain other "retained" carriers and

the implementation of that decision unreasonably restrained trade in the business of transporting new motor vehicles from points of manufacture or assembly in or near Detroit, Michigan, to any other point in the United States, or that Chrysler thereby attempted to monopolize such trade.

35. Chrysler's decision to no longer tender traffic to Crawford and other "non-retained" carriers and to continue to tender traffic to Commercial and certain other "retained" carriers and the implementation of that decision did not unreasonably restrain trade in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to any other point in the United States, and Chrysler did not thereby attempt to monopolize such trade.

36. Between June 27, 1957 and July 8, 1957 Crawford, Dixie Transport Company, Inc. (hereinafter called "Dixie") and several other common carriers by motor vehicle with Interstate Commerce Commission rights into the southeastern part of the United States held numerous discussions and meetings at which they generally agreed to form a new corporation under the name of Southern Transport, Inc. (hereinafter called "Southern") and to sell to it their respective operating rights and to make available to it their operating equipment in the hope that such new corporation having broad Interstate Commerce Commission rights would be tendered traffic by Chrysler. On or about July 8, 1957 Chrysler notified the participants in the proposed new corporation that if Southern should be incorporated as proposed and receive temporary authority from the Interstate Commerce Commission and to operate as a common carrier before the commencement of shipment of Chrysler's 1958 models, Chrysler would consider tendering traffic to it as a "retained" carrier.

37. In the summer of 1957, Commercial acquired all of the stock of Auto Express, Inc., a small carrier which held direct line operating rights from Detroit, Michigan, to the State of Florida. Auto Express, Inc. was a "non-retained" carrier. Commercial, which did not have such direct line authority from Detroit, Michigan, to Florida, had begun negotiations for the purchase of Auto Express, Inc. in 1954 after representatives of the Cadillac Division of General Motors Corporation had suggested that Commercial obtain direct line authority to Florida. In the fall of 1956, representatives of Chrysler also suggested that Commercial, which had been hauling Chrysler vehicles to Florida by a combined truck-barge-truck route, "round out" its authority by obtaining direct line rights to that state through the purchase of Auto Express, Inc. The evidence indicates that the price paid by Commercial for the stock of Auto Express, Inc. was fair and the acquisition and subsequent merger of Auto Express, Inc. into Commercial was approved by the Interstate Commerce Commission.

38. On July 17, 1957 Chrysler held a meeting in Detroit, Michigan, with representatives of the "retained" carriers to announce its traffic policies for the 1958 model vehicle shipments. Representatives of the proposed Southern including Mr. Sam Crawford, Vice President of plaintiff Crawford, were invited and attended the meeting. At the meeting Chrysler again announced as it had at the meeting on May 17, 1957, that it would no longer honor dealer requests as to carrier selection and that henceforth the "retained" carriers would be expected to solicit Chrysler business from Chrysler alone and to cease soliciting such business through solicitation of its dealers. It distributed to the representatives present, maps of the country showing the areas thereof into which, commencing with the shipment of its 1958 models, Chrysler planned to tender traffic to particular carriers, including Southern, based on each carrier's destination territories as fixed by the Interstate Commerce Commission. In announcing its proposed allocation of traffic to individual carriers, Chrysler emphasized that these were intended only as indications of Chrysler's present intent and that Chrys-

ler would from time to time make such changes in its traffic policies as it might deem appropriate. During the meeting Chrysler expressed the hope and expectation that the "retained" carriers would not increase their rates, would use Dodge trucks in the transporting of Chrysler made vehicles and would not enter into interchange agreements relating to Chrysler traffic with carriers who were not "retained" carriers without Chrysler's written approval.

39. Commercial was notified by Chrysler at the July 17 meeting that, among other traffic, Chrysler intended to tender to Commercial all of its traffic to the state of Kentucky. A portion of the traffic to the eastern portion of Kentucky had been tendered to plaintiff Crawford during the model year 1957 and prior model years (virtually all Chrysler traffic to the western portion of Kentucky had been tendered to Commercial in the model year 1957 and in prior years because Commercial had been the only carrier with direct line authority from Detroit to such area). Although temporary approval had been granted by the Interstate Commerce Commission for Commercial's acquisition by merger of the direct line operating rights of Auto Express, Inc. into the state of Florida, Chrysler announced that all of its direct line traffic into that state during the model year 1958 would be tendered to Southern and that Commercial would not participate in such traffic. There is no evidence from which it can be determined whether the traffic which Chrysler at the July 17 meeting announced that it would tender to Commercial, or which it in fact tendered to Commercial thereafter was a larger or a smaller percentage of the Chrysler traffic from Detroit or of Chrysler traffic from all Chrysler plants, than Commercial had enjoyed during the 1957 model year or prior model years.

40. There is no evidence that Chrysler solicited an agreement from any of the "retained" carriers to hold the line on rates, to use Dodge trucks or to refrain from interlining or entering into leasing arrangements with "non-retained" carriers or with Crawford or threaten to or imposed any sanctions for non-compliance with its announced policy.

41. There is no evidence that Commercial or any other "retained" carrier entered into any contract, combination, agreement, understanding or conspiracy with Chrysler to hold the line on rates, to use Dodge trucks or to refrain from interlining or entering into leasing arrangements with "non-retained" carriers or with Crawford.

42. Chrysler did not enter into any contract, combination, agreement, understanding or conspiracy with any "retained" carrier under which Chrysler made territorial allocations of its business among the "retained" carriers or under which any "retained" carrier agreed to use Dodge trucks in the transporting of Chrysler made vehicles or to refrain from interlining or entering into leasing arrangements with "non-retained" carriers or with Crawford or to hold the line on rates and Chrysler did not solicit an agreement or understanding from any of the "retained" carriers on these matters nor did it threaten to or impose any sanctions for non-compliance with its announced policy.

43. Southern was organized in August, 1957. In the beginning of October, 1957, the Interstate Commerce Commission granted to Southern temporary operating authority into certain states in the southeastern part of the United States. Thereupon Chrysler tendered traffic to Southern for shipment of its 1958 model vehicles to points of destination in the states of Florida, Georgia, North Carolina and South Carolina and continued to do so for that entire model year.

44. In exchange for the operating rights it transferred to Southern, plaintiff Crawford received a 19% interest in all the outstanding voting stock of Southern. Southern leased from Crawford and the other participating carriers their operating equipment under terms of payment approved by the Interstate Com-

merce Commission, and Southern used Crawford's equipment to transport in interstate commerce Chrysler's 1958 model vehicles in accordance with an agreement under which the stockholders of Southern allocated among themselves the traffic that Chrysler tendered to Southern. In August of 1958, Southern went out of business.

45. Plaintiff does not allege, nor was there any evidence that Commercial participated in or was in any way involved in the formation, operation or dissolution of Southern.

## CONCLUSIONS OF LAW

1. The evidence as a whole does not support the controverted allegations of the Complaint.

2. Defendant Chrysler did not combine, conspire or enter into any contract, agreement, understanding or concert of action with defendant Commercial, the other alleged co-conspirator, or any other individual or corporation to restrain trade or to eliminate competition in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to points of destination throughout the United States or to the states of Ohio, West Virginia, Kentucky and North Carolina in violation of Section 1 of the Sherman Act.

3. Defendant Commercial did not combine, conspire or enter into any contract, agreement, understanding or concert of action with defendant Chrysler, the other alleged co-conspirators, or any other individual or corporation to restrain trade or to eliminate competition in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to points of destination throughout the United States or to the states of Ohio, West Virginia, Kentucky and North Carolina in violation of Section 1 of the Sherman Act.

4. Defendant Chrysler did not attempt to monopolize or combine or conspire or enter into any contract, agreement, understanding or concert of action with defendant Commercial, the other alleged co-conspirators, or any other person or persons to monopolize trade or commerce in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to points of destination throughout the United States or to the states of Ohio, West Virginia, Kentucky and North Carolina in violation of Section 2 of the Sherman Act.

5. Defendant Commercial did not attempt to monopolize or combine or conspire or enter into any contract, agreement, understanding or concert of action with defendant Chrysler, the other alleged co-conspirators, or any other person or persons to monopolize trade or commerce in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to points of destination throughout the United States or to the states of Ohio, West Virginia, Kentucky and North Carolina in violation of Section 2 of the Sherman Act.

6. No violation of Section 1 of the Sherman Act has been shown.

7. No violation of Section 2 of the Sherman Act has been shown.

8. Plaintiff has shown no right to relief upon the facts and law, and defendant Chrysler's timely motion for dismissal and defendant Commercial's timely motion for dismissal, under Rule 41(b) of the Federal Rules of Civil Procedure are granted, and judgment in favor of the defendants shall be entered in accordance with these findings of fact and conclusions of law.