**CRAWFORD TRANSPORT COMPANY,**
Incorporated, Plaintiff-Appellant,

v.

**CHRYSLER CORPORATION and Com-**
mercial Carriers, Incorporated,
Defendants-Appellees.

**No. 15307.**

United States Court of Appeals
Sixth Circuit.

Oct. 17, 1964.

C. Gibson Downing, Lexington, Ky. (John W. McKenzie, Ashland, Ky., James Park Sr., Lexington, Ky., on the brief; Stoll, Keenon & Park, Lexington, Ky., of counsel), for appellant.

Frederick T. Shea, New York City (Caldwell & Robinson, Ashland, Ky., Kelley, Drye, Newhall, Maginnes & Warren, New York City, on the brief; Keith A. Jenkins, Detroit, Mich., of counsel), for Chrysler Corp.

Ralph C. Menapace, Jr., New York City (J. Woodford Howard, Prestonsburg, Ky., on the brief; Cahill, Gordon, Reindel & Ohl, Corydon B. Dunham, Jr., New York City, of counsel), for Commercial Carriers.

Before WEICK, Chief Judge, CECIL, Circuit Judge, and PECK, District Judge.

CECIL, Circuit Judge.

This appeal involves an alleged violation of Sections 1 and 2 of the Sherman Act. (Sections 1 and 2, Title 15 U.S.C.) The case was tried to the court without a jury. After the plaintiff had completed the presentation of its evidence, the trial judge sustained the defendants' motion, made in accordance with Rule 41(b) of Federal Rules of Civil Procedure, to dismiss the action. The trial judge gave an oral opinion, made findings of fact and conclusions of law in writing 235 F.Supp. 751, and entered judgment for the defendants.

There is no material dispute over the basic facts upon which the litigation is predicated. The plaintiff-appellant, Crawford Transport Company, Incorporated, hereinafter called Crawford, is a corporation organized under the laws of West Virginia with its principal place of business in Ashland, Kentucky. It is a common carrier, by motor vehicle, certificated by the Interstate Commerce Commission, with rights, among others, to transport in interstate commerce new automobiles, and related products in initial movements from points in and near Detroit, Michigan, to points in Ohio, Kentucky, West Virginia and North Carolina. Prior to October, 1958, its principal business was the transportation of Chrysler motor vehicles. Chrysler Corporation, hereinafter called Chrysler, one of the defendants-appellees, and a manufacturer of motor vehicles, is incorporated under the laws of Delaware and has its principal place of business at Detroit, Michigan. Commercial Carriers, Inc., hereinafter called Commercial, the other defendant-appellee, is a corporation organized under the laws of Delaware, with its principal place of business at Romulus, Michigan.

At the time of the commencement of this action and for many years prior thereto Chrysler marketed its products through a system of Direct Dealers, with each of whom it entered into a Direct Dealer Agreement. The agreement [1] between Chrysler and its dealers, in effect in 1952 and thereafter, gave Chrysler the sole power to determine the means and manner of delivering vehicles purchased

---

1. "Sales Agreement between (divisional name) Direct Dealer and Chrysler Corporation, ........ Division. Delivery of Motor Vehicles.

"(Chrysler) may deliver motor vehicles by rail, haulaway, boat, or any other means of transport, or deliver them for driveaway, in conformance with the policy of (Chrysler) at the time. (Chrysler) may deliver motor vehicles to a carrier that (Chrysler) selects consigned to the city or town where DIRECT DEALER'S place of business is located (or to an unloading point located conveniently near that city or town) 'to (Chrysler's) order, notify DIRECT DEALER,' or may deliver them directly to DIRECT DEALER at Detroit, Michigan, or at any other point that (Chrysler) hereafter may establish."

by the dealer, to prepay the freight and to bill the dealer for a transportation charge in addition to the sale price of the vehicle. Prior to November, 1954, Chrysler sold its vehicles to its dealers f. o. b. at the point of manufacture or assembly. The dealers then paid all shipping costs direct to the carriers on billing from them. During this time the carriers competed for business by soliciting both the dealers and the manufacturers.

In November, 1954, Chrysler changed its policy and began to sell its vehicles to its dealers on a "freight prepaid" basis. Under this system the carriers billed the freight costs to Chrysler and received payment from it. Chrysler then billed the dealer for the price of the vehicle plus the cost of transportation. Chrysler chose or approved the carriers and selected the method of transportation.

In February, 1956, Chrysler again changed its policy and began billing its dealers a "destination charge" for the delivery of its vehicles. This charge varied from area to area and for different model vehicles. In fixing this charge Chrysler took into consideration its transportation costs as well as comparable charges made by Ford and General Motors.

Chrysler organized Chrysler Motors Corporation, referred to herein as Motors, in September, 1956. This was a wholly-owned sales subsidiary incorporated under Delaware law. In November, 1956, Chrysler entered into an agreement with Motors by which it assigned to Motors all its direct sales agreements with dealers throughout the United States and agreed to sell to Motors' dealers all vehicles manufactured and assembled by Chrysler for domestic retail sale. Chrysler retained the right to prepay freight and to choose the means of transportation and the carrier to be used on all vehicles sold to Motors and shipped to its dealers. (We attach no significance to the organization of Motors, so far as this action is concerned. It took no independent action in any of the transactions which give rise to Crawford's complaint.)

In 1955, Howard J. Connelly, Director of Traffic for Chrysler, began a study of Chrysler's transportation practices with a view to adopting a more efficient and economical system of distribution of the Company's products. This study ultimately led to the adoption of the plan which is the subject of this litigation. The plan as adopted on January 9, 1957, provided for the reduction from approximately eighty to sixteen carriers whose services Chrysler would retain. The retained carriers were to be selected on the basis of past performance, growth potential, financial stability, freedom from competitive alliances and adequacy of certificate rights. The major advantage claimed by Chrysler for the plan was insuring " * * * the timely, economical delivery of the vehicular products of this corporation to the dealer and customer through the efficient employment of transportation facilities."

On May 17, 1957, Chrysler held a meeting in Detroit attended by representatives of all the carriers then transporting Chrysler vehicles from Detroit. The new plan was announced at this meeting and the changes in traffic policy were explained in detail. The representatives were advised as to the five criteria upon which each carrier would be evaluated to determine whether it would be selected as a retained carrier. It was also announced at this meeting that individual discussions would be held with representatives of each carrier at which time each carrier would be advised whether it would be a retained carrier for the shipment of 1958 model automobiles in September, 1957.

Crawford was notified about June 20, 1957, that Chrysler would not tender traffic to it commencing with the shipment of 1958 model vehicles. Approximately fifty other carriers were so notified between May 17th and July 17, 1957. Chrysler notified Commercial about June 27, 1957, that it would be a retained carrier. Chrysler gave similar notices to approximately fifteen other carriers.

Subsequently Crawford, Dixie Transport Company, Inc. and several other

non-retained common carriers with Interstate Commerce Commission rights into the southeastern part of the United States formed a new corporation under the name of Southern Transport, Inc., referred to herein as Southern, to which Chrysler agreed to tender traffic. In the summer of 1957, consummating negotiations dating back to 1954, Commercial acquired all of the stock of Auto Express, Inc., a small (nonretained) carrier which held direct line operating rights from Detroit, Michigan, to the State of Florida.

Chrysler held a meeting in Detroit, Michigan, on July 17, 1957, with the representatives of all the retained carriers to announce its traffic policies for the 1958 model vehicle shipments. Mr. Sam Crawford, Vice President of Crawford, attended the meeting as a representative of the proposed Southern. At this meeting Chrysler announced that it would no longer honor dealer requests as to carrier selection and that retained carriers would be expected to solicit Chrysler business from Chrysler. It distributed maps of the country showing the areas into which Chrysler planned to tender traffic to particular carriers, including Southern, based on each carrier's destination territories as fixed by the Interstate Commerce Commission. It was also announced that Chrysler would, from time to time, make such changes in its traffic policies as it might deem appropriate. During this meeting, Chrysler expressed the hope and expectation that the retained carriers would not increase their rates, would use Dodge trucks and would not enter into interchange agreements with non-retained carriers without Chrysler's written approval. It was suggested by Chrysler that the retained carriers had an obligation to review the facilities of the non-retained carriers, meet with their executives and where applicable reach agreement as to possible absorption, merger, consolidation or purchase of equipment. The retained carriers were urged to conduct such negotiations on a fair and equitable basis.

At the July 17th meeting, Commercial was notified that Chrysler intended to tender to it all of the traffic for the state of Kentucky. In 1957 and prior years, Crawford had been given a portion of the traffic to Eastern Kentucky, and Commercial had been given the traffic to Western Kentucky. The organization of Southern was completed in August, 1957, and Chrysler thereupon tendered to it traffic for the shipment of 1958 model vehicles to destination points in the states of Florida, Georgia, North Carolina and South Carolina.

Crawford transferred operating rights to Southern and in exchange therefor received 19% of all of Southern's outstanding voting stock. Southern leased from Crawford and the other participating carriers operating equipment under terms of payment approved by the Interstate Commerce Commission. Southern went out of business in August, 1958.

It was estimated by Chrysler that its new plan of transporting motor vehicles to its dealers would save it several millions of dollars annually in shipping costs.

The principal question presented on this appeal is whether Chrysler violated Section 1 of the Sherman Act by tying to the sale of its new motor vehicles to its dealers, the sale of the transportation service required to deliver the motor vehicles from the point of manufacture to the dealer. It is well established by decisions of the Supreme Court that it is a per se violation of Section 1 of the Sherman Act for a seller of one product, as a condition of the sale of that product, to unreasonably require the purchaser to buy another product if a substantial amount of business is affected. Northern Pacific Railway Co. v. United States (1958), 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545; Times-Picayune Publishing Co. v. United States (1953), 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277; International Salt Co., Inc. v. United States (1947), 332 U.S. 392, 68 S.Ct. 12, 92 L. Ed. 20.

The specific question here is whether the plan adopted by Chrysler for the de-

livery of its 1958 and subsequent model vehicles is the type of tying arrangement that has been judicially condemned as a violation of Section 1 of the Sherman Act. The trial judge held that it was not. We agree.

■■ Chrysler contends that, "a tying arrangement is an unreasonable restraint of trade when a seller, by tying the sale of one item to the sale of another, is using his dominance in the tying item's market to avoid the hazards of free competition in the tied item's market." It further contends that the condemned type of tying arrangement involves a seller who not only competes in the tying item's line of commerce but participates for profit in the area of competition to which the tied item belongs. Counsel for Crawford concedes that if Chrysler's position is correct concerning the type of tie-in sale that is judicially condemned as a violation of the Sherman Act the trial judge correctly decided the issue. The International Salt Co., supra, and the Northern Pacific Railway, supra, cases are typical examples of tie-in sales that are judicially condemned.

In International Salt the company leased its patented machines for the utilization of salt products with the requirement that the lessees must purchase from it the salt and salt tablets used in the machines. In Northern Pacific the company sold land which it owned with the requirement that the purchasers ship the produce raised on the land over the railroad which it operated. United States v. General Motors Corp., 121 F.2d 376, C.A.7, 1941, strongly relied on by counsel for the appellant is of the same type. General Motors attempted to tie to the sale of its motor vehicles, financing to the purchaser of those motor vehicles through General Motors Acceptance Corporation, a wholly owned subsidiary engaged in the business of automobile financing.

Osborn v. Sinclair Refining Co., 286 F.2d 832, C.A.4, cert. den. 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 falls into the same category as the cases above cited. There Sinclair Refining Company [2] tied the sale of its products to Osborn, a dealer, to the sale of products of Goodyear Tire and Rubber Company with whom it had an agreement. Both Sinclair and Sherwood entered into an agreement with Goodyear in 1944 by which they agreed to actively assist Goodyear in selling and in promoting the sale of Goodyear TBA to their dealers. Goodyear was to pay Sinclair and Sherwood a 10% commission on tires and batteries sold to their dealers and commissions of 5% to 10% on car and home merchandise. The court found that Sinclair entered into an express agreement with Osborn to purchase the Goodyear products in order that he might be restored as a gasoline dealer. Osborn's failure to abide by this arrangement contributed to the subsequent cancellation of his lease from Sinclair. Sinclair received a direct profit from its tying arrangement. Having an agreement to sell Goodyear products for a commission, Sinclair is in the same position as though it had tied one of its own products to the sale of gasoline.

More nearly parallel to the facts in the case before us are Miller Motors, Inc. v. Ford Motor Company, 252 F.2d 441, C.A. 4, and Nelligan v. Ford Motor Company, 262 F.2d 556, C.A.4. In these cases regionally organized Lincoln-Mercury dealers were instrumental in creating advertising funds, which came to be known as LMDA. Each dealer contributed to LMDA from the sale of each Lincoln and Mercury car, an amount agreed upon by the regional organization. The Ford Motor Company cooperated with this plan and it was known among dealers that Ford policy required dealers to become members of LMDA. It was also a part of Ford policy to terminate a dealer's franchise if he resigned from LMDA. These actions were brought by dealers who charged that Ford violated Section 1 of the Sherman Act by

2. Used interchangeably with Sherwood Bros., Inc., a wholly owned subsidiary.

tying the requirement to contribute to LMDA to the dealer franchise. In both cases the court held there was no violation. In the Miller case the court said, at p. 446 of 252 F.2d: "It is not shown that Ford had any interest in the Kenyon and Eckhardt advertising agency except to obtain effective advertising service from it. Ford was not using its economic position as an automobile manufacturer to invade and dominate the advertising business."

The court distinguished the General Motors case, supra, which distinction is apropos to our case. It said, at p. 447: "In the General Motors case, to the contrary, it was shown that the defendant, reaching out to monopolize the business of financing the resale of automobiles of its manufacture, formed a conspiracy unreasonably to interfere with commerce. The court declared that the mandatory scheme to impose the financing of automobile sales *through a concern which it wholly owned, and whose profits it enjoyed,* was unreasonable and bore no relation to the good will of General Motors or its line of cars." (Emphasis added.) The statement of counsel for the appellant that the Fourth Circuit reversed the principle of the Ford Motor cases a year later in the Sinclair Refining case has no support in fact.

No case has been cited to us nor have we found any contrary to the principle of judicially condemned tie-ins as stated by counsel for Chrysler.

Considering now the facts of the case before us, Chrysler owned no transportation companies and had no financial interest in any of the transportation carriers to which it tendered traffic for its 1958 and subsequent models. It did not seek to invade and dominate the automobile transportation carriers' business. True, Chrysler benefited financially to the extent that it saved millions of dollars in the cost of transportation but it received no direct profits from the transportation carriers. Chrysler made no permanent commitments to any of the carriers which it selected to transport its 1958 model

vehicles. As was announced at the meeting of July 17, 1957, it would, from time to time, make such changes in its traffic policies as it deemed appropriate.

The purpose of the Sherman Act is to preserve for industry free access to competitive markets and to prevent monopolies in restraint of trade. It is well to take a look at the commodity and at the nature of the business with which we are dealing here. Chrysler is a manufacturer of automobiles. Its two great competitors are Ford and General Motors. The public interest lies in the protection of that competition. Chrysler found it necessary to centrally control the delivery of automobiles to dealers in order to compete more effectively with Ford and General Motors in all areas of the country. To allow Chrysler's financial position in the field of automobile manufacture to be sapped and drained through unnecessary transportation costs would be unreasonable. To subordinate Chrysler's interest to that of the transportation companies, would, so to speak, permit the tail to wag the dog. What benefits Chrysler ultimately inures to the benefit of Chrysler dealers and to the public.

"In the absence of any purpose to create or maintain a monopoly, the act (Sherman) does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S. Ct. 465, 468, 63 L.Ed. 992.

We conclude that Chrysler was guilty of no tying arrangement in violation of Section 1 of the Sherman Act.

Another claim made by Crawford is that Chrysler and Commercial violated Section 1 of the Sherman Act by entering into a combination and conspiracy with Motors and other retention carriers in restraint of trade among the several states for the purpose of: eliminating competition, and costs of competition to retention carriers, including Commercial,

in the business of transporting new motor vehicles from points of manufacture to dealer locations; to stabilize freight rates; to increase under supervision of Chrysler the size of retention carriers by absorption of assets of Crawford and other nonretention carriers; and to allocate to retention carriers, free from competition of Crawford and other nonretention carriers, specified territories and percentages of business of transporting dealer-owned new vehicles.

Finally, it is claimed on behalf of Crawford that Chrysler, acting alone or in combination or conspiracy with defendant Commercial, Motors or other retention carriers, violated Section 2 of the Sherman Act by acting with an intent to eliminate competition of Crawford and other nonretention carriers in the business of transporting new motor vehicles from Detroit, and with an intent to create a monopoly in the business of transporting such motor vehicles.

■ These claims are equally without merit. We find no evidence of any contract, combination or conspiracy in restraint of trade or any attempt on the part of Chrysler, alone, to monopolize the business of transportation of new motor vehicles, or by combination with Commercial, Motors or any of the other retention carriers to monopolize such business. Nor do we find evidence of usurpation by Chrysler of the Interstate Commerce Commission's authority over rates charged and areas served by interstate carriers.

On the issues of combination and conspiracy in violation of Sections 1 and 2 of the Sherman Act, the trial judge found facts as follows: "There is no evidence that Chrysler undertook its program to reduce the number of motor carriers to whom it tendered traffic by reason of or pursuant to any unlawful contract, combination, agreement, understanding or conspiracy with defendant Commercial or with any other individual or corporation.

"Chrysler's decision to reduce the number of motor carriers to whom it tendered traffic was a unilateral one made by it for the sole purpose of obtaining a more efficient and economical distribution of its products and was not made as a part of or pursuant to any unlawful contract, combination, agreement, understanding or conspiracy with defendant Commercial or with any other individual or corporation.

"There is no evidence that Chrysler undertook its program to reduce the number of motor carriers to whom it tendered traffic in an attempt to monopolize trade in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to any other point in the United States.

"Chrysler's decision to reduce the number of motor carriers to whom it tendered traffic was not made in an attempt to monopolize trade in the business of transporting new motor vehicles from points of manufacture or assembly in and near Detroit, Michigan, to any other point in the United States."

■ The evidence supports these findings of fact. Neither the findings of basic facts nor the inference drawn therefrom are clearly erroneous. This Court is bound to accept the factual inferences drawn by a trial judge from undisputed basic facts, unless they are clearly erroneous. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218; United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; Evans v. Commissioner, 330 F.2d 518, 519, C.A.6; In re Plonta, 311 F.2d 44, 47, C.A.6.

The findings of fact of the trial judge are supported by the evidence and his conclusions of law are in accordance with accepted legal principles.

The judgment of the District Court is affirmed.