Stanley KUGLER, Plaintiff,

v.

AAMCO AUTOMATIC TRANSMIS-
SIONS, INC., a Pennsylvania
corporation, Defendant.

No. 4–71–Civ. 192.

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 16, 1971.

Paul Van Valkenburg, Van Valkenburg, Moss & Flaherty, Minneapolis, Minn., for plaintiff.

John C. McNulty, Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for defendant.

## MEMORANDUM DECISION

LARSON, District Judge.

Before this Court are three motions. Plaintiff and defendant both seek summary judgment and, in the alternative, defendant asks for a change of venue. Each party in moving for summary judgment claims that there are no fact issues to be resolved.

The instant case is a rematch between these two parties, the first bout having been a protracted five week affair in State court, during the fall of 1970. The plaintiff, an AAMCO franchisee, and defendant were both named as defendants in an equitable proceeding brought by the Attorney General of the State of Minnesota in May of 1967. That suit sought to enjoin the present parties, along with all other AAMCO franchisees in Minnesota, from engaging in certain alleged fraudulent advertising and business practices. As a part of that suit, a cross-complaint was filed by Kugler against AAMCO, wherein Kugler alleged that AAMCO had provided him with the fraudulent advertising which was the proximate cause of the initiation of the Attorney General's action. Kugler contended that as a result thereof his business had been totally destroyed. The equitable suit was settled before trial. However, the cross-claim was fully litigated in the State action referred to above and at the conclusion of that trial Kugler was denied recovery on the ground that he was a knowing and willing participant in the fraudulent advertising and sales practices. That result is currently on appeal.

Plaintiff subsequently initiated this action for damages in which he contends that the fraudulent advertising supplied by AAMCO violated Section 1 of the Sherman Act (15 U.S.C. § 1) in that it was illegally tied to the franchise agreement which granted him the license to use the AAMCO trademark. Tying arrangements are by definition arrangements whereby the seller offers one product only on the condition that a second product also be purchased. Such schemes have long been looked upon with disfavor by the Supreme Court. Fortner Enterprises, Inc. v. U. S. Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L. Ed.2d 495 (1969); Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U. S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); United States v. Lowe's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); Northern Pacific R.R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); International Salt Co. v. United States, 332 U.S. 392, 68 S. Ct. 12, 92 L.Ed. 20 (1947); I.B.M. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936).

Tying arrangements are not new but their application to the rapidly emerging franchising industry requires a basic understanding of franchising.[1] While many business relationships may be covered by a broad definition of franchising, one thing common to each of them is that the franchisee gives up some element of control over his business. What he receives in return is determined by the type of franchise he is operating.

---

1. For an extended discussion of tie-ins in the franchising industry, see McCarthy, "Trademark Franchising and Anti-Trust: The Trouble with Tie-ins," 58 Cal.L.Rev. 1085 (1970).

In the "rent a name" [2] type franchise, in which AAMCO can be included, the franchisee purchases the franchisor's trademark, with its attendant goodwill. It is easy to see how a situation in which one party inherently must relinquish some control over his business is ripe for charges of trade regulations, such as illegal tying.

Recent cases involving allegations of illegal tying in franchise agreements have followed similar patterns. A franchisor would only agree to sell a product —often, as in this case, the product was his tradename—if the franchisee would agree to buy other independent products from him. Usually those products were needed in the business but could have been purchased from other suppliers, i. e. packaging materials. In Siegel v. Chicken Delight, Inc., 311 F.Supp. 847 (N.D.Cal.1970), the Court specifically held that the franchise license itself was capable of being a tying item, and thus franchisors who conditioned sale of their license on the purchase of other goods were illegally restraining trade unless there was a legitimate business reason for such tying. Plaintiff herein alleges a similar situation.

■■ In any tie-in case, whether it involves a franchise or not, before looking at the various factors necessary to prove a violation of the Sherman Act it is imperative that a court make a determination that two separate products are in fact involved. If it finds that the controversy is really over a "single product," then tying is not possible.[3] Fortner Enterprises, Inc. v. United States Steel Corp., supra; Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). In Chicken Delight, supra, the Court rejected plaintiff's argument that the franchising system as a whole was a single product. There Chicken Delight conditioned the granting of a franchise on an agreement to also purchase packaging items, cookers, and mix preparations solely from them. The Court in a well reasoned opinion held that the packaging items and cookers were not part of the single product, i. e., the Chicken Delight System.

While the "single product" doctrine is well established, there are few cases which have delineated the criteria for determining singleness. The leading case in this area is apparently United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960). There the Court set out four criteria for separability:

"There are several facts presented in this record which tend to show that a community television antenna system cannot be characterized as a single product. Others who entered the community antenna field offered all of the

2. McCarthy classifies all franchises in three categories: Manufacturing franchises, where the manufacturer exploits some process or secret formula by licensing others to manufacture and distribute the end product; distributing franchises, where the manufacturer is provided with a system of marketing his wares at either the wholesale or retail level; and rent a name franchises. See McCarthy, supra, at 1089.

3. There is apparently some confusion between the "single product doctrine" and possible defenses to charges of illegal ties. The single product question must be answered before there can be any investigation into the alleged tie. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). If there is a finding that a single product is involved, the matter is ended, since by definition in order to have a tie there must be both a tying and a tied product. On the other hand, even if there is a finding of an illegal tie, it is possible for the defendant to assert certain defenses. The most common of these is that there is a sound business reason (other than increasing profits) for the tie. This has been held to be justification for ties. Fortner Enterprises Inc. v. United States Steel Corp., supra; Siegel v. Chicken Delight Inc., 311 F. Supp. 847 (N.D.Cal.1970) ; United States v. Jerrold, Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960). Because of the result reached herein, consideration is only given to the single product question. No consideration is given to any defenses the defendant might have had.

equipment necessary for a complete system, but none of them sold their gear exclusively as a single package as did Jerrold. The record also establishes that the number of pieces in each system varied considerably so that hardly any two versions of the alleged product were the same. Furthermore, the customer was charged for each item of equipment and not a lump sum for the total system. Finally, while Jerrold had cable and antennas to sell which were manufactured by other concerns, it only required that the electronic equipment in the system be bought from it." 187 F. Supp. at 559.

Transposing these criteria to the facts of this case is somewhat difficult due to the inherent differences between franchising operations and the situation in *Jerrold.* In order to use the *Jerrold* criteria it is important to keep in mind that the alleged tying item here is the trademark license and the tied item is alleged to be the national advertising mats provided Kugler by AAMCO. The first *Jerrold* criterion concerns the practices of others in the field. In describing the practices of franchisors, Professor McCarthy has said:

> "In marketing this kind of franchise, (rent a name) the franchisor typically invests a large initial sum to develop a franchise idea for a standardized product or service, chooses a catchy trademark *and advertises it extensively*, picks out likely locations for franchised outlets, and, finally, sells franchises to people who dream of being successful, independent businessmen." 58 Cal.L.Rev. at 1089 (1970). [Emphasis added.]

Franchisors of this type franchise must necessarily provide advertising as part of the package, for that is the essence of what they are selling the franchisee. If there were no national advertising continuing over the period of the license, there would be little advantage for the franchisee. What he gains by becoming associated with the franchisor is the national goodwill created by nationwide advertising. If there were no national image there would be little value to ownership of a franchise.

The second *Jerrold* criterion is also met here. Virtually all versions of the product, *i. e.*, the "rent a name" franchise package, are the same in form. By definition they include national advertising. If there were no national advertising, the franchisor would have nothing else to market in this type of franchising system, since all he is selling is his name, which has been created and maintained on a nationwide scale via advertising. See McCarthy, "Trademark Franchising and Antitrust: The Trouble with Tie-ins," 58 Cal.L.Rev. 1085 at 1089, 1109 (1970).

Similarly, the third *Jerrold* criterion is also present here. There is no dispute that Kugler was charged but one lump sum for all services included in the AAMCO franchising package. There were not separate charges for advertising, training, and the other benefits provided by AAMCO; all of these things were covered by the lump sum payment for the license to use the AAMCO name. This is further shown by the undisputed fact that despite a constantly fluctuating volume of national advertising there was never a fluctuation in the amount paid by Kugler for the license.

Finally, there was nothing in the "name package" which was sold by AAMCO to its franchisees which was optional. The training, advertising, and sales help were all a part of what each franchisee purchased. There was no option to take the training program but decline the advertising.

A similar test for determining separability is suggested by Professor McCarthy. He contends that whether separate items are involved is a question of economics, and he concludes that the proper way to answer the economic question is to look at the industry as a whole to determine if the items have or can be sold separately. Generally, franchisors of the "rent a name" franchises

sell a package consisting of the trademark license which is made up of its component parts, advertising, training, goodwill, and sales help. What the franchisee expects to purchase is the right to use the trademark with all of the continuing goodwill and consumer recognition that goes with it. Without advertising to establish and promote goodwill, franchisors would have nothing to sell, so it is customarily a part of the license package they present to a franchisee.

The case at bar is clearly distinguishable from Susser v. Carvel Corp., 332 F. 2d 505 (2nd Cir. 1964), and Chicken Delight, supra. Both of those cases dealt with franchisors who tied completely independent products to their franchise license. Cooking and packaging equipment are easily viewed as separate from the license to use the franchise trademark. When they are forced upon a franchisee as a condition of his receiving the franchise, they rightfully are said to be tied. But here there is no such tie. Advertising was not tied to the purchase of the license; it was the essence of the license. If franchisors could not charge for national advertising, then one of the chief methods of distributing goods and services in this country would be effectively emasculated.[4] Kugler paid for AAMCO's good name while he was a franchisee. He paid for the business he would receive as a result of the fact that AAMCO was known in all parts of the country. The way AAMCO became known, to a large extent, was due to extensive national advertising. Without the good name built up by large scale national promotion Kugler would have been "just another small businessman struggling to become known and accepted in the community."[5] This is what he purchased, and he should not now be heard to complain that it was illegally tied to the license. For it was not tied, but rather inexorably bound as a part of the license itself.

This Court is not unaware of the Supreme Court's admonition that summary proceedings should be used sparingly in complex antitrust litigation. Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed. 2d 458 (1962). However, this case is an appropriate one for summary judgment. There is no question of motive or intent here which would be amplified by witness testimony. It is clear that the advertising supplied to the franchisee by AAMCO was a part of the license package, as it is in other similar franchise arrangements. As such, the trademark license and the advertising are a single product, and there is no set of facts which plaintiff could prove which would entitle him to relief in an action for illegal tying.[6]

Because of the disposition of this case, a ruling on defendant's motion for a change of venue would not have to be made. However, this Court is disposed to also rule on that motion at this time. Since the facts relating to venue in the instant case are identical to those in the case of McCarthy and Kelkar, Inc. v. AAMCO, Inc., 4–70–Civ. 523, decided by this Court on February 18, 1971, the motion is denied for the reasons stated therein.

For the reasons and authorities set out above the defendant's motion for summary judgment is hereby granted and the action is dismissed. Plaintiff's motion for partial summary judgment must be, and is, denied.

4. See McCarthy, supra, at 1086.

5. Id., at 1109.

6. The apparent harshness of a summary judgment is mitigated in this case by the fact that a full trial herein would for the most part have been a rehash of the issues already explored in the prior State action.