**ANDERSON FOREIGN MOTORS, INC.,**
**on behalf of itself and all others**
**similarly situated, Plaintiffs,**

v.

**NEW ENGLAND TOYOTA DISTRIBU-**
**TOR, INC., et al., Defendants.**

**Civ. A. No. 76–417–G.**

United States District Court,
D. Massachusetts.

Aug. 29, 1979.

Donald B. Gould, Goodwin, Proctor & Hoar, Boston, Mass., for plaintiffs.

James D. St. Clair, Robert W. Mahoney, Hale & Dorr, Boston, Mass., for defendants.

James F. McHugh, John J. Curtin, Jr., Bingham, Dana & Gould, Boston, Mass., for Toyota Motor Sales, U.S.A., Inc.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

The precise characterization of the motions now before the court is disputed by the parties. Anderson Foreign Motors, Inc., a Toyota automobile dealer, brought this class action against New England Toyota Distributor, Inc. (hereinafter NET) and George A. Butler, formerly President and Treasurer and now Chairman of the Board and Chief Executive Officer of NET,[1] for violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.[2] Plaintiffs complain of an allegedly illegal tying arrange-

---

1. The original complaint included as a defendant Toyota Motor Sales, U.S.A., the national Toyota distributing concern which imported and distributed automobiles to regional wholesale distributor-franchisees like NET. Toyota Motor Sales, however, was subsequently removed as a party-defendant on request of counsel.

2. Although tying arrangements can violate both Section 1 of the Sherman Act and Section 3 of the Clayton Act, only the former statutory provision applies to this case, since the juris-

dictional prerequisites for a Clayton Act violation are not present. In particular, the tied product in this case, delivery services, is not within the Clayton Act's prohibition against ties involving "goods, wares, merchandise, machinery, supplies or other commodities." 15 U.S.C. § 14; *see, Moore v. Jas. H. Matthews & Co.*, 9 Cir. 1977, 550 F.2d 1207, 1214; *United States v. Jerrold Electronic Corporation*, E.D. Pa.1960, 187 F.Supp. 545, 554, *aff'd per curiam*, 1961, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806.

ment in which defendants require dealers to purchase NET's new car delivery services along with the purchase of Toyota automobiles for resale. On April 12, 1978, following a hearing, this court granted plaintiffs' motion for class certification, defining the class as all persons and entities who were Toyota dealers after January 25, 1972.

Plaintiffs now bring two motions: (1) a motion pursuant to Fed.R.Civ.P. Rule 64 for approval of the attachment of certain real property and assets and (2) a motion pursuant to Fed.R.Civ.P. Rule 65 for a preliminary injunction to limit the disposition of certain stock and assets of NET controlled by the defendants.

■ Plaintiffs seek through the pending motions to secure payment of an eventual judgment entered in plaintiffs' favor by restraining the disposal of certain assets in any manner injurious to plaintiffs' interests. The characterization problem stems from the nature of the property that plaintiffs wish to encumber: (1) specific parcels of real estate owned by NET and Butler and assets owned by NET and (2) the stock, rights, and assets of NET. Although real estate can be the subject of an ordinary motion for attachment under Massachusetts law,[3] Mass.R.Civ.Pro., Rule 4.1; M.G.L. c. 223, § 42, stock cannot be attached in an action seeking only money damages, M.G.L. c. 223, § 71. *But see, Krohn Hite v. Berube,* D.Mass.1974, 372 F.Supp. 1262, 1263 (state court appears to have effected equitable attachment by injunction). Plaintiffs, therefore, have treated what is in reality a motion for an equitable attachment of defendants' stock and assets as a motion for a preliminary injunction prohibiting NET and Butler from transferring or diminishing the value of the stock and assets other than in the ordinary course of business.

■ We must first decide a threshold question as to the availability of a provisional remedy in the form of the preliminary injunction that plaintiffs seek. This issue was not discussed by the parties, but since it relates to the power of this court, we must address it. Fed.R.Civ.P. Rule 64 makes state law control the availability of provisional remedies to secure satisfaction of a judgment, and specifically provides that "[t]he remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, . . ." The precise scope of Rule 64 is somewhat unclear. *See,* 7 Moore's Federal Practice ¶ 64.04[3]. According to a narrow interpretation of the Rule, 7 Moore's, *supra,* at 64–20–21, the phrase "and other corresponding or equivalent remedies, . . ." was never intended to exclude temporary equitable relief otherwise proper under Fed.R.Civ.P. Rule 65, even though that relief operates only to secure satisfaction of a final judgment and state law offers no equivalent remedy. Under this interpretation, we plainly have power to grant plaintiffs' motion, whether or not Massachusetts law permits equitable attachment of shares of stock.

However, the Rule is susceptible of a broader interpretation. It may make state law the *exclusive* source of available remedies to secure a final judgment. Even under this broad interpretation, we still have power to grant plaintiffs' motion for a preliminary injunction. The motion in effect seeks an equitable attachment. *Daley v. Ort,* D.Mass.1951, 98 F.Supp. 151, 152. Although in *Daley* a motion identical to plaintiffs' motion in this case was denied because the court could find no authority for an equitable attachment prior to verdict under Massachusetts or federal law, the court appears to have overlooked M.G.L. c. 214, § 3(7), (formerly M.G.L. c. 214, § 3(8)),

---

**3.** Fed.R.Civ.P. Rule 64 requires that a federal court look to the law of the forum state for any provisional remedies to secure a final judgment:

At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought . . . .

which confers jurisdiction on the Supreme and Superior courts in "actions to reach and apply shares or interests in corporations, . . . ." Massachusetts state courts rely on § 3(7), together with their power to issue injunctions *pendente lite*, to grant a plaintiff an equitable attachment of defendants' shares of stock by restraining their transfer prior to final adjudication of plaintiff's substantive claim. *See, McCarthy v. Rogers*, 1936, 295 Mass. 245, 3 N.E.2d 787; *cf., Salvucci v. Sheehan*, 1965, 349 Mass. 659, 662–63, 212 N.E.2d 243. Hence Massachusetts law appears to provide a procedure comparable to that used by plaintiffs in this case, and we will treat plaintiffs' motion for a preliminary injunction as in the nature of an action to reach and apply coupled with a motion for temporary relief.

We now turn to the standards for exercising our power under Rules 64 and 65. The conditions for issuance of a writ of attachment are set forth in Mass.R.Civ.Pro., Rule 4.1(c), which requires that the plaintiff show "a reasonable likelihood that [he] will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant to be available to satisfy the judgment." *Cf.*, M.G.L. c. 223, § 42A. Because there is no evidence of liability insurance, the central question on the motion for approval of attachment is whether plaintiffs are likely to prevail on the merits and obtain damages in the necessary amount. Massachusetts law empowers the attaching officer under certain circumstances to require security from the plaintiff before or after attachment in order to indemnify the officer from liability for an improper attachment. M.G.L. c. 223, § 45A. Otherwise, there is no requirement for an attachment bond.

The standards for granting the preliminary injunction that plaintiffs seek differ only slightly from those governing the attachment. The due process clause of the Fourteenth Amendment compels the notice and hearing procedures implemented by Mass. Rule 4.1(c). *Bay State Harness Horse R. & B. Ass'n v. PPG Industries, Inc.*, D.Mass.1973, 365 F.Supp. 1299. The preliminary injunction that plaintiffs seek will limit disposition of stock and assets owned or controlled by defendants and thus also amounts to a deprivation of property within the meaning of the Fourteenth Amendment, requiring prior notice and hearing. *Fuentes v. Shevin*, 1972, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556. In particular, plaintiffs must demonstrate more than just a probability of success on the merits in order to prevail on their motion for a preliminary injunction; they must also show a reasonable likelihood that they will recover a judgment in excess of the total value of the property that is the subject of plaintiffs' two motions. *Cf., Fuentes, supra*, at 97,[4] 92 S.Ct. 1983.

Because plaintiffs' motion under Rule 65 is in the nature of a equitable attachment, we do not require a strong showing of irreparable injury or a favorable balance of harms. Plaintiffs fear that they will not be able to obtain satisfaction for a final judgment that likely may exceed twelve million dollars, see, Part II.A *infra*, without executing on the stock and assets of NET. It is our opinion that this fear is reasonably justified. Moreover, if defendants were to sell the stock and other personal property and, with the proceeds, purchase real estate, plaintiffs would be able to attach the real estate under Mass. Rule 4.1(c) without showing irreparable harm. There

4. Of course, the seven million dollar attachment includes property that is also covered by the motion for a preliminary injunction. The overlap should not be counted twice, since attachment alone constitutes a sufficient property deprivation to trigger due process requirements. In addition, because NET no longer distributes Toyota automobiles in New England, it may be that NET's stock has no value apart from the value of the company's assets. If so, the stock would add nothing to the total value of the property plaintiffs wish to encumber. On the other hand, NET's stock may be worth more than the attachment amount of $5,000,000 or even more than likely damages of $12,000,000. At this point, we lack sufficient information to make these determinations.

is no reason for a different result in this case just because the property happens to be in the form of stock.

[9] After reviewing the numerous briefs and affidavits, we find that plaintiffs have demonstrated a probability of success on the merits and a reasonable likelihood of recovering a judgment in excess of seven million dollars and have otherwise satisfied the requirements of Mass.R.Civ.P. Rule 4.1(c). Therefore, we grant plaintiffs' motion for approval of attachment in the requested amount of seven million dollars. However, we cannot decide the motion for a preliminary injunction without some evidence of the value of the property that is the subject of that motion. Furthermore, without such evidence we are also unable to set the amount of the bond required by Fed.R.Civ.P. Rule 65(c). Therefore, we are issuing a contemporaneous procedural order calling for either a stipulation of the parties or evidence of the value of the property and briefs on the issue of the amount of the security that should be required.

The parties have submitted a number of relevant affidavits in connection with both the current motion and the prior motion for class certification. Before embarking on an analysis of the issues, we will first outline generally the significant factual background. NET was the sole distributor of Toyota automobiles in the five state New England area—Vermont, Maine, New Hampshire, Massachusetts and Rhode Island—until March 1978 when Toyota Motor Sales, U.S.A., Inc. (hereinafter TMS), the national distributor-franchisor, assumed NET's New England distributorship. Pursuant to standard franchise agreements between NET and its dealers, NET sold automobiles to New England Toyota dealers, transporting the cars from the Port of Boston to the dealers' various locations in the five state area. Prior to 1972 NET had subcontracted this transportation function to independent common carriers and had required dealers to reimburse NET for its transportation costs. In that year, however, NET unilaterally changed its transportation policy, relying on the right it reserved in its dealer franchise contracts, "to deliver all Toyota products purchased by DEALER by whatever mode of transportation and from whatever point DISTRIBUTOR may from time to time establish or select." *Toyota Dealer Sales and Service Agreement,* Article III, ¶¶ 1, 2 (Defendants' Exhibit 1 to 5/10/76 Deposition of Ross Anderson); *accord, Toyota Dealer Sales and Service Agreement,* Article VI, ¶ B.1 (Plaintiffs' Exhibit 1 to 5/10/76 Anderson Deposition) ("most recent" agreement). NET purchased a number of tractors and trailers and in 1972 began to transport the vehicles to dealers on its own trucks, charging the dealers for the cost of carrying the cars according to Article III, ¶ 2, of the earlier Sales and Service Agreement. The contract between TMS and NET required NET to execute this standard Agreement with each of its dealers. *See, 11/2/70 and 3/7/73 Distributor Agreements between Toyota Motor Sales, U.S.A., Inc. and New England Toyota Distributors, Inc.,* Article III. Each dealer was charged the same average amount for each automobile he purchased, the total charge for all automobiles averaged over all the cars sold.

The change in delivery policy met with some opposition, mainly from the Toyota Dealer Council, an independent dealer body organized to negotiate modifications in some of NET's policies. The Dealer Council and vocal dealers objected to what they felt were excessive delivery prices charged by NET. At a later date, the dealers, dissatisfied with the efforts of the Council, formed the Toyota Dealers Alliance to continue negotiations with NET. Following unsuccessful attempts to change NET's transportation policy, the Dealers Alliance filed a complaint with the Federal Trade Commission in July 1976 alleging an illegal tie of the sale of automobiles to the sale of delivery services. The present action was commenced on January 30, 1976.

Defendants make two principal arguments in opposition to plaintiffs' motions. First, they contend that plaintiffs are unlikely to succeed on the merits for three reasons: (1) that a Section 1 violation re-

quires a conspiracy and after dismissal of TMS there is no basis for a conspiracy finding; (2) that delivery services and automobiles are a single product, a delivered car, and thus there can be no unlawful tie; and (3) that even if automobiles and delivery services are separate products, there is no proof that plaintiffs suffered any injury as a direct result of the tie since plaintiffs have not shown that defendants "coerced" them into purchasing the two in tandem. Second, defendants argue that in any event plaintiffs have failed to show that they are likely to recover damages in excess of the property they seek to attach. In the following analysis we discuss each argument separately.

I. *Probability of Success on the Merits*

A. *Background*

■■■■ A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pac. R. Co. v. United States*, 1958, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545. Not all tie-ins fall within the Sherman Act's prohibition against a "contract, combination, . . . or conspiracy in restraint of trade . . . ." The theory of illegal tie-ins has evolved in response to the dual economic evils of tying: the tying arrangement harms competing sellers of the tied product by foreclosing them from access to the market for reasons having nothing to do with the merits of the tying seller's product, and harms buyers by restricting their range of choice in the tied product market. *Northern Pac. R. Co., supra*, at 6, 78 S.Ct. 514; *Times-Picayune v. United States*, 1953, 345 U.S. 594, 605, 73 S.Ct. 872, 97 L.Ed. 1277. The seller who enjoys a powerful position in the tying product market seeks to extend his economic power into the tied product market. Since demand for the tied product varies directly with demand for the tying product, the seller need only reduce the price of his tying product in order to increase sales of the tied product. In this manner he is able to reap his monopoly profit at the same time as gaining a foothold in the market for the tied product. It is this leverage made possible by the seller's strong economic position in the typing product market that offends antitrust values. *Times-Picayune, supra*, at 614, 73 S.Ct. 872; see, W. S. Bowman, Jr., *Tying Arrangements and the Leverage Problem*, 67 Yale L.J. 19 (1957).

■■■■ Historically, courts have treated tying arrangements as *per se* illegal. In order to establish an illegal tie, under the *per se* theory, the plaintiff must prove (1) that tying and tied products are separate, *Fortner Enterprises v. U.S. Steel (Fortner I)*, 1969, 394 U.S. 495, 507–508, 89 S.Ct. 1252, 22 L.Ed.2d 495, (2) that the defendant has sufficient economic power with respect to the tying product appreciably to restrain free competition in the market for the tied product, *Fortner Enterprises (Fortner I), supra*, at 499–500, 89 S.Ct. 1252; *Northern Pacific R. Co., supra*, 356 U.S. at 6, 78 S.Ct. 514. It is also relevant to consider whether the seller's behavior follows the general pattern found unacceptable in earlier tying cases. *Kentucky Fried Chicken v. Diversified Packaging*, 5 Cir. 1977, 549 F.2d 368, 375.

■■■■ Courts have developed two inroads on the *per se* doctrine in tying cases. Some courts have expanded the concept of two separate products by permitting business justifications for aggregation of the products to enter into the single product analysis. *See, Dehydrating Process Co. v. A. O. Smith Corp.*, 1 Cir. 1961, 292 F.2d 653, 655–57, *cert. denied* 1961, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194; *Forrest v. Capital Buildings & Loan Assn.*, E.D.La.1974, 385 F.Supp. 831, 838–39, *aff'd per curiam*, 5 Cir. 1974, 504 F.2d 891, *cert. denied*, 1975, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470; *Automatic Radio Mfg. Co. v. Ford Motor Company*, D.Mass.1965, 242 F.Supp. 852, 856–57; *United States v. Jerrold Electronics Corporation*, E.D.Pa.1960, 187 F.Supp. 545, 558–60, *aff'd per curiam* 1961, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806; L. A. Sullivan, *The Law of Antitrust*, 443 (1977).

By holding that a challenged arrangement constitutes only a single product, courts have avoided the strictures of the *per se* approach entirely, even though at times producing rather unusual results. *See, e. g., Jerrold Electronics Corporation, supra* (components of antenna system are single product during start-up phase of business but separate products at a later stage). A second line of attack, which is often not clearly distinguished from the first, takes the form of increasing the availability of affirmative defenses to a liability finding. *See, Kentucky Fried Chicken, supra*, at 376–78; *Northern v. McGraw-Edison Co.*, 8 Cir. 1976, 542 F.2d 1336, 1347, *cert. denied* 1977, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544; *Baker v. Simmons Company*, 1 Cir. 1962, 307 F.2d 458; *Jerrold Electronics Corporation, supra*, at 556–58; Annot., 14 A.L.R.Fed. 458, 492, 495 (1973). Although these two approaches are often confused, there is an important difference. The plaintiff has the burden of proof on all issues implicated in the single product determination, whereas the defendant has the burden of proof with respect to each affirmative defense. In our opinion, there is no need in the instant case to sort out who should bear the burden as to each issue in this case, *see generally*, M. E. Ross, *The Single Product Issue in Antitrust Tying: A Functional Approach*, 23 Emory L.J. 963, 989–992, 1011–14, since it appears likely that even if plaintiffs were assigned the burden of proof on all issues, they would still prevail.

■ In addition to the elements of the *per se* doctrine already discussed, the plaintiff in a private antitrust action must also show as part of his case in chief that he was injured by the challenged practice. *See, Ford Motor Co. v. Webster's Auto Sales, Inc.*, 1 Cir. 1966, 361 F.2d 874, 883. Once the prima facie case is established the defendant may respond with several affirmative defenses based on limited business justifications. Finally, the plaintiff's failure to prove all elements of the *per se* theory does not foreclose his antitrust claim; the challenged practice must then be examined according to the rule of reason in order to determine if a violation of Section 1 of the Sherman Act has nevertheless occurred. *Fortner Enterprises (Fortner I), supra*, 394 U.S. at 499–500, 89 S.Ct. 1252.

■ It should also be noted that a Section 1 violation does not require a conspiracy, to which the multitude of Section 1 tying cases involving a single seller of tied and tying products amply attests. *See generally, Northern Pac. R. Co., supra; Times-Picayune, supra; International Salt Co. v. United States*, 1962, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20. "Tying arrangements are condemned under [Section 1] as 'contracts in restraint of trade.'" *Baker, supra*, at 467. In the instant case, the required element of concerted action is supplied by the existence of the vertical tie-in contract containing the tie-in clause, *viz.*, Article III, ¶¶ 1, 2 of the *Toyota Dealer Sales and Service Agreement*, as interpreted and enforced by NET. *Bogosian v. Gulf Oil Corporation*, E.D.Pa.1975, 393 F.Supp. 1046, 1048, 1048 n. 3, *rev'd on oth. grds.*, 3 Cir. 1977, 561 F.2d 434, *cert. denied*, 1978, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791; *see, Osborn v. Sinclair Refining Company*, 4 Cir. 1963, 324 F.2d 566, 573; *cf., United States v. Parke, Davis & Co.*, 1959, 362 U.S. 29, 44–47, 80 S.Ct. 503, 4 L.Ed.2d 505; *United States v. Schrader's Son, Inc.*, 1920, 252 U.S. 85, 99–100, 40 S.Ct. 251, 64 L.Ed. 471; *Ford Motor Co., supra*, at 879; *Sum of Squares, Inc. v. Market Research Corp. of Am.*, S.D.N.Y.1975, 401 F.Supp. 53, 55–56. In *Solomon v. Houston Corrugated Box Co., Inc.*, 5 Cir. 1976, 526 F.2d 389, upon which defendants rely, the court expressly found that the contract between the two defendants was "not restrictive in any sense," *id.*, at 394. This answers defendants' argument that plaintiffs cannot assert a Section 1 violation following the dismissal of TMS as a party.

### B. *Is there a tie?*

■ Having carefully examined the parties' arguments on this important issue, the court concludes that Toyota automobiles and delivery services are two separate prod-

ucts for purposes of determining a Section 1 violation. Because the parties devoted so much attention to this issue, we will present our analysis in some detail.

One initial point deserves special mention. Labeling a product aggregation does not involve a process of discovery; there are no a priori, determinate categories of single products that might serve as templates against which to measure the particular product configuration at issue. Any such judgment is basically normative, requiring an answer to an essentially prescriptive question: should the seller be forced to market the products separately?

■ Standards for analyzing a product aggregation have been developed by only a few courts. *See, e. g., Siegel v. Chicken Delight,* 2 Cir. 1971, 448 F.2d 43, 47–49; *Kugler v. AAMCO Automatic Transmissions, Inc.,* D.Minn.1971, 337 F.Supp. 872, 874–76, *aff'd* 8 Cir. 1972, 460 F.2d 1214; *Jerrold Electronics Corporation, supra* at 559. *See generally,* 2 Callman, *Unfair Competition, Trademarks and Monopolies,* § 38.-2(b)(1)(b) (3d ed. 1969. Supp.1977). In *Siegel,* the challenged arrangement involved the tying of certain supplies to the sale of franchise licenses. An important issue was whether a license could ever be a separate tying product. The court summarized the necessary inquiry in the following terms:

> In determining whether an aggregation of separate items should be regarded as one or more items for tie-in purposes in the normal case of sales of products, the courts must look to the function of the aggregation. Consideration is given to such questions as whether the amalgamation of products resulted in cost savings apart from those reductions in sales expenses and the like normally attendant upon any tie-in, and whether the items are normally sold or used as a unit with fixed proportions. 448 F.2d at 48.

*Jerrold Electronics Corporation* sets forth more specific guidelines: (1) whether other members of the industry sell the products separately, (2) whether versions of the alleged single product differ in significant respects, (3) whether the customer is charged separately for the products, and (4) whether any components of the alleged single product are sold separately. *Id.* at 559. *Kugler* used two approaches to determining whether advertising, the tied product, and an AAMCO franchise license, the tying item, were one product for antitrust purposes. The court first applied the four *Jerrold Electronics* standards, and then it looked to the industry as a whole to determine if the products had been or could be sold separately. 337 F.Supp. at 875.

These three cases support a four-pronged analysis: (1) examination of the product structure itself, (2) investigation of the defendant's product marketing practices, (3) consideration of the behavior of other industrial sellers and (4) analysis of the efficiencies gained by and the business justifications for the product combination. We will discuss each factor in turn.

■ An examination of the product structure in the instant case reveals several important points. The automobile product and the delivery service do not naturally merge into a third identifiable unit. Moreover, the finished Toyota automobile delivered at the Post of Boston is able to perform all the functions for which it was designed. Delivering it to the dealer's location adds nothing to the automobile *qua* automobile. In short, there is no relationship between the car and its delivery inherent in the nature of the automobile itself and thus no conceptual barrier to treating the two as separate products. *See, Fortner Enterprises v. U. S. Steel (Fortner I),* 1969, 394 U.S. 495, 508–09, 89 S.Ct. 1252, 22 L.Ed.2d 495.

NET, however, sold its transportation services in a fixed one-to-one proportion to the sale of its cars. The dealer was not required to purchase carrying services from NET above and beyond those needed to move the cars that he bought. Although in many cases this factor might offer some support for a single product conclusion, *see,* D. Turner, *The Validity of Tying Arrangements Under the Antitrust Law,* 72 Harv.L. Rev. 56, 68–72 (1958), the facts of this case greatly weaken its persuasive force. The

only need dealers might have had for NET carrying services in addition to car delivery from Boston was the occasional transportation of vehicles sold or exchanged between dealers from one dealer's location to the other's premises. The initial delivery of automobiles thus represents the overwhelming segment of dealer demand for car delivery services.

NET's product marketing approach is also relevant. Although the dealer pays one price for the car, the carrying charge is an item separable from the cost of the vehicle. The dealer can quote the ultimate consumer a base price for the car that does not include carrying and handling charges. The fact that these costs are kept distinct suggests that both the dealer and NET treated the car and its delivery as separate items. *See, Jerrold Electronics Corporation, supra.* On the other hand, there is no evidence that NET sold its transportation services to other than its franchised dealers and for purposes other than the transportation of its automobiles.

■ Much of the controversy surrounding this issue focussed on the third factor, the significance of intra-industry comparisons. Defendants submitted evidence suggesting that throughout the domestic automobile industry distributors control the transportation of vehicles to their dealers. The general acceptance of this aggregated product configuration, defendants insist, is strong support for the existence of a single product. We disagree. A favorable intra-industry comparison, although relevant, is by no means conclusive on the single product issue. *See, Jerrold Electronics Corporation, supra,* at 559. All firms in an oligopolistic market, for example, might use the same economically inefficient, but financially lucrative, tie-in. If the uniformity of the practice were determinative, a clearly suspect tying arrangement would often be insulated from *per se* scrutiny.

The comparison that defendants offer suffers from a serious weakness. Their evidence shows that although automobile manufacturers do control delivery of their vehicles, all—except for Subaru—employ independent common carriers to transport the cars.[5] NET uses its own trucks. This is a crucial distinction. Defendants are wrong in arguing that the only important question is who ought to have the right to control transportation services. Of equal importance is how that control is exercised. The single product determination frequently hinges as much on the way the two products are coupled and on the character of each product as on the fact that their sales are connected at all. *See, e. g., Kentucky Fried Chicken, supra; Crawford Transport Company v. Chrysler Corporation,* 6 Cir. 1964, 338 F.2d 934, *cert. denied,* 1965, 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971; *Miller Motors, Inc. v. Ford Motor Company,* 4 Cir. 1958, 252 F.2d 441, 446; *Forrest v. Capital Building & Loan Assn.,* E.D.La. 1974, 385 F.Supp. 831, *aff'd per curiam,* 5 Cir. 1974, 504 F.2d 891, *cert. denied* 1975, 421 U.S. 978, 95 S.Ct. 1980. The ultimate concern of antitrust theory is with the anticompetitive effect generated by particular economic practices. Because different ways of tying two products can produce different market effects, they can also have different antitrust consequences.

In this case, NET's practice of using its own trucks has a potentially more serious economic impact than does an approach which employs independent common carriers and, therefore, NET gains no support from the marketing practices of other automobile distributors. First, the use of independent common carriers encourages the development of a market in the tied product. NET's practice, on the other hand, removes a substantial segment of the demand for delivery services from the competition of that market. Secondly, automobile manufacturers who use independent carriers can allow dealers to suggest potential carriers for the distributor's approval, perhaps according to a set of pre-established

---

**5.** Prior to 1972, NET itself had subcontracted the delivery function to independent common carriers.

criteria. This kind of arrangement, although superficially similar to NET's practice, permits more dealer freedom than does NET's scheme, and dealer freedom of choice is an important value protected by tie-in law.

With respect to the fourth factor implicated in single product analysis—the business justifications for one product treatment—defendants suggest two reasons for distributor control over delivery. First, they insist that distributor selection of carriers is necessary to ensure timely delivery of a first class product for resale to the consumer. The reputation of Toyota and thus the livelihood of the manufacturer and distributor is made or broken at the dealer level, and therefore the distributor has a strong interest in supervising the dealer's management of his business in order to ensure product quality. Second, defendants suggest that NET's delivery system enhances efficient marketing of Toyota cars by promoting competition among dealers located at varying distances from Boston. Without a centralized delivery scheme, they argue, dealers closest to Boston would have a decided competitive advantage, since their transportation costs would be less than those of outlying dealers.

Business justifications for aggregated product treatment, however, have been interpreted very narrowly. *Cf., Standard Oil Co. v. United States,* 1949, 337 U.S. 293, 306, 69 S.Ct. 1051, 93 L.Ed. 1371. Consider, for example, defendants' first justification: the preservation of customer goodwill and product reputation. Although some courts use quite general terms when discussing this issue, the cases involve factual situations in which the tying arrangement at stake was the only way that the seller could ensure the maintenance of goodwill. *See, e.g., Baker, supra* (mattress company's leasing of signs to motels, advertising company's mattresses available in motel, necessitated requirement that motel stock only company's mattresses); *Dehydrating Process Co., su-*

*pra,* at 657 (tie of silo to sale of unloader justified by customer complaints of improperly functioning unloader when bought separately and absence of any other supplier manufacturing silos to defendant's specifications). And recently some courts have made these limitations explicit [6] *Kentucky Fried Chicken, supra,* at 376; *Northern, supra,* 356 U.S. 1, 78 S.Ct. at 519.

*Kentucky Fried Chicken,* a case upholding an approved source system by which the franchisor exercised some control over supply sources used by its franchisees, adopted a least restrictive alternative-type analysis to confine the goodwill defense:

> [T]he franchisor is free to demonstrate that the tie constitutes a necessary device for controlling the quality of the end product sold to the consuming public. . . . As part of this defense, however, the franchisor must establish that the tie constitutes the method of maintaining quality that imposes the least burden on commerce. If there are less burdensome alternatives, a franchisor is obligated to employ them rather than the tie. 549 F.2d at 376.

The facts of the instant case do not support such a compelling business justification. Defendants have suggested no reason why NET could not merely issue a list of common carrier requirements to dealers and permit dealers to select carriers that conform to those requirements. In *Northern v. McGraw-Edison Co.,* 8 Cir. 1976, 542 F.2d 1336, *cert. denied* 1977, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544, the court struck down an arrangement whereby the purchase of dry cleaning equipment from the seller was tied to the sale of the dry cleaning franchise. The *Northern* court recognized a goodwill-product quality defense but limited it to those situations in which substitutes for the tied product had to comply with such precise and detailed specifications that other manufacturers might not be able to market a product functionally compatible with the tying product. *Id.* at

---

**6.** This trend appears to be most marked in those opinions which analyze justifications as affirmative defenses; however, their teachings apply with equal force to the single product issue.

1347. Defendants' product quality argument failed to meet this exacting standard. It is unlikely that NET will fare any better with its tying arrangement.

Even if central control over delivery proved to be necessary, there are less restrictive alternatives available to NET. Cf., *Kentucky Fried Chicken, supra* at 376. *Crawford Transport Company, supra,* illustrates one such alternative. Like Chrysler in the *Crawford* case, NET could assume control over the selection of independent common carriers according to a set of established standards. Furthermore, both dealers and independent carriers could suggest candidates, and NET might then select among them, perhaps limiting the total number. We do not suggest that such an arrangement would not violate Section 1 under any circumstances, but it does seem likely that it would not be *per se* illegal.

The second NET interest, promoting inter-dealer competition, will also not justify the restrictive tying arrangement in the instant case, even assuming substantial inter-dealer competition. All centrally controlled delivery systems further this interest to the same extent, and as discussed above, there are less burdensome alternatives to the system NET has selected.

Thus, each of the four prongs of single product analysis outlined above points in the direction of treating new cars and delivery services as two separate products. *See, BBD Transportation Co., Inc. v. U.S. Steel Corp.,* N.D.Calif.1976, 1976–2 Trade Cases (CCH) ¶ 61079 at 69874. *See generally,* M. E. Ross, 23 Emory L. J., *supra,* at 1014; Note, *Product Separability: A Workable Standard to Identify Tie-In Arrangements Under the Antitrust Laws,* 46 S.Calif.L.Rev. 160 (1972). Cost savings seem unlikely to result from jointly selling an automobile and a service which is entirely independent of the manufacture of the car to which it is tied. *See,* D. Turner, 72 Harv.L.Rev., *supra,* at 71–72. Indeed, dealer objections to the arrangement in the instant case suggest that it might not be an economically efficient approach.

Defendants place considerable reliance on *Crawford Transport Co. v. Chrysler Corporation,* E.D.Ky.1962, 235 F.Supp. 751, *aff'd* 6 Cir. 1964, 338 F.2d 934, *cert. denied* 1965, 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971, quoting extensively from the opinion of the District Court. Holding that Chrysler's selection of independent common carriers to transport cars sold to its dealers did not offend Section 1 of the Sherman Act, the District Court reasoned that Chrysler's strong interest in seeing to it that cars are delivered in a form attractive to consumers necessitate treating transportation as "part of the sale of an automobile", 235 F.Supp. at 753, 755. The District Court did not devote an in-depth analysis to this issue and in particular did not consider less restrictive alternatives to the approach employed by Chrysler. Moreover, as the opinion of the Court of Appeals made clear, the *Crawford* arrangement differed significantly from the arrangement in the instant case. In *Crawford,* independent common carriers were used to haul the cars; Chrysler did not profit in any way from the provision of transportation services and, therefore, did not use its economic position in the automobile market as leverage to invade the car delivery market. NET, on the other hand, used its own trucks and, as plaintiffs claim, profited from providing delivery services. Although the Court of Appeals stressed the economic necessity for central control of automobile delivery, 338 F.2d at 939, it did not draw the same conclusion from this observation as the District Court had done, *viz.,* that it supported a single product inference. Instead, the Court of Appeals based its conclusion on the absence of any economic gain to Chrysler. Cf., *Ohio-Sealy Mattress Mfg. Co. v. Seely, Inc.,* 7 Cir. 1978, 585 F.2d 821, 835, *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486.

In response to our question at the hearing, both sides submitted briefs on the issue of who had title to the automobiles before acceptance by the dealers. Defendants argue that NET retained title, while plaintiffs contend that title passed to the dealers at some point prior to completion of delivery. We doubt whether title has any rele-

vance to the existence of an illegal tie. We have been unable to locate any case which turns on this factor, and neither party offers any argument on the merits based on title. In our opinion, enforcement of the antitrust laws should not depend on the technical requirements and ambiguities of "title".

If NET were responsible for damage to the automobiles in transit (whether or not it had formal "title"), it might be reasonable to allow NET considerable latitude in arranging for safe delivery. However, in this case plaintiffs have shown to our satisfaction a reasonable likelihood that dealers were responsible for transit damage to cars during a good portion of the time period spanned by plaintiffs' claims. Defendants' argument to the contrary based on the September 8, 1978 affidavit of Mr. Benson DeWitt, in which he claims that NET reimbursed dealers $18,762.91 for repairs dealers made as a result of car damage at Boston or in transit during the period 1975 through 1977, overlooks the fact that NET was then both seller and common carrier and as common carrier, not as seller, was responsible for the loss.

Even if NET, as seller, were responsible for damage, it does not follow that NET was justified in tying delivery to cars. As we discussed *ante*, there are several less restrictive alternatives that adequately protect product quality in this case.

■ From the foregoing analysis it appears that NET's arrangement conforms to the classic model of a tie-in. There is a tying product, Toyota automobiles, and a tied product, automobile delivery, and there are markets in both the tied product and the tying product. NET, seller of the tying product, also sold the tied product, *cf., Kentucky Fried Chicken, supra*, at 377; *Crawford Transport Company, supra; Miller Motors, Inc., supra*, at 446, and dealers had to purchase the tied product from NET. Finally, NET's arrangement was authorized by neither state nor federal law. *Cf., Forrest v. Capital Buildings & Loan Assn., supra*, at 837.

■ This is not a case of a company unilaterally extending itself into a new market by horizontal or vertical integration, which without more does not generally offend Section 1. When a firm integrates horizontally or vertically, it enters the new market as a competitor, and the increase in competition is plainly desirable. In the instant case, however, NET did not enter the common carrier market as a competitor. To the contrary, it exploited its franchisees' dependence to secure its own economic position by creating a steady demand for its services. Although Toyota automobiles were an integral feature of the franchise arrangement, delivery services were not. Thus, NET's arrangement suffers from the evils common to all illegal ties.

## C. Seller's Economic Power

■ After *Northern Pac. Ry. Co. v. United States*, 1958, 365 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545, plaintiffs in a tying case need not prove a tying product monopoly but only that defendants enjoyed sufficient economic power in the tying product market appreciably to restrain free competition in the tied product market. *Id.*, at 11, 78 S.Ct. 514; *accord, Fortner Enterprises v. U.S. Steel (Fortner I)*, 1969, 394 U.S. 495, 502–03, 89 S.Ct. 1252, 22 L.Ed.2d 495. An appreciable restraint is shown if the seller exercises some control over some of the buyers in the market and enjoys an advantage over competing tying product suppliers. *U.S. Steel Corp. v. Fortner Enterprises (Fortner II)*, 1977, 429 U.S. 610, 621–22, 97 S.Ct. 861, 51 L.Ed.2d 80; *Fortner Enterprises (Fortner I), supra*, 394 U.S. at 503, 89 S.Ct. 1252.

The tying product market in this case is the market for new automobiles—foreign and domestic—and the relevant buyers are dealers in those automobiles. By virtue of its franchise agreements, NET controlled a group of those dealers, namely those who sold Toyota automobiles in the five state New England area. It thus appears likely that plaintiffs will be able to satisfy the *Fortner* standards.

### D. *"Not Insubstantial" Amount of Interstate Commerce*

In view of the very liberal interpretation given this element of the tying test by the Supreme Court, it is quite probable that plaintiffs will be able to demonstrate that "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimus* is foreclosed to competitors by the tie . . . ." *Fortner Enterprises (Fortner I), supra,* at 501, 89 S.Ct. at 1258. Other common carriers engaged in the new vehicle delivery business in New England were foreclosed from access to that portion of the tied product market represented by the sale of Toyota vehicles to regional Toyota dealers.

### E. *Causation*

It appears likely from the affidavit evidence submitted by both parties that plaintiffs have suffered injury in the form of overcharges for new car delivery. Since NET changed its transportation policy in 1972, the freight and handling charge has been a hotly disputed issue between the dealers, acting first through the Toyota Dealer Council and then through the Toyota Dealer Alliance, and NET. Furthermore, following the termination of NET's distributorship franchise and TMS' assumption of New England distribution, TMS, making use of independent common carriers, reduced the delivery cost from the $139.95 per car charged by NET to $77.50 per car. The marked difference between these two figures, plaintiff maintains, can only be explained as an overcharge by NET.

▬ Defendants argue that TMS is able to charge less for delivery because, by eliminating NET's distributorship, TMS earns more profit on each automobile. Even assuming TMS now makes more from the sale of an automobile, it is not apparent to this court, and defendants have not explained,

why TMS should choose to absorb some of its legitimate delivery costs instead of charging the entire $139.95 to its dealers. It seems probable both from the long history of negotiations between NET and its dealers and the unexplained reduction in delivery charges following the entry of TMS as the New England distributor that NET had overcharged dealers for its delivery services.[7]

▬ Defendants argue further that even if plaintiffs could prove their claims of injury resulting from NET's delivery overcharges, they are still unable to demonstrate that the challenged tying arrangement was a material cause of that injury, since dealers voluntarily accepted NET's exclusive control over vehicle delivery. In a private antitrust action, the plaintiff, in addition to proving a violation and an injury, must also show that the violation was the direct and material cause of the injury he suffered. *See, Ford Motor Co. v. Webster's Auto Sales, Inc.,* 1966, 361 F.2d 874, 883. Plaintiff's burden on the causation issue is not a heavy one; he need only establish the causal connection "with reasonable probability" and to "a fair degree of certainty." *Id.*

As we understand defendants, they argue that in order to establish causation, buyers in a private antitrust action must prove that they were coerced by the seller to purchase the tied product. It is unclear at precisely which point proof of coercion is relevant. Often it has been treated as a factor in determining the existence of a tie. In other cases it has entered into the liability analysis as an element relevant to a seller's possession of market power. And on occasion coercion has been viewed as a requirement of plaintiff's standing under Section 4 of the Clayton Act, that is, to establish that plaintiff was harmed by the

---

**7.** In oral argument, defendants contended that the dealers suffered no injury at all because they passed on any overcharges to consumers. In general defendants who are direct purchasers cannot make use of a pass-on theory to defend against a private antitrust damages action. *Illinois Brick v. Illinois,* 1977, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707; *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 1968, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231. Nor is it likely that this case falls within any exception to the *Hanover Shoe* doctrine, if any exists. *See, Illinois Brick, supra,* 431 U.S. at 743–45, 97 S.Ct. 2061.

tie-in. Our analysis bears on the relevance of coercion to all facets of this case.

■ We are impressed with the array of considerations arguing against a coercion requirement in a case like the instant one involving an express tie. As the court in *Bogosian v. Gulf Oil Corp.*, 3 Cir. 1977, 561 F.2d 434, *cert. denied*, 1978, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791, explained:

> It has never been an element of plaintiff's case to disprove, nor even a permitted defense, that the tied product is superior to others available on the market, or that even without the tie requirement plaintiff would have purchased the tied product. The short answer to defendants is, and always has been, that without a tie requirement, "[i]f the manufacturer's brand of the tied product is in fact superior to that of competitors, the buyer will presumably choose it anyway." *Standard Oil v. United States*, 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949).
>
> 561 F.2d at 449

Distinguishing an earlier case, *Ungar v. Dunkin' Donuts of America, Inc.*, 3 Cir. 1976, 531 F.2d 1211, *cert. denied*, 1976, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84, on which numerous courts have relied to support the coercion requirement in varied fact situations, the *Bogosian* court held, at 450, that a plaintiff need only show that the seller expressly conditioned the sale of the tying product on the purchase of the tied product. Whereas in *Ungar* coercion was relevant to proving the existence of the tie because the conditional nature of the sale was not apparent from the express agreement or from the operation of its terms, the challenged gas station leases in *Bogosian* expressly required the lessee to purchase specified amounts of defendant's gasoline. The instant case is on all fours with *Bogosian* : the conditioning of the sale of cars on the purchase of delivery services from NET is manifest in the provisions of the dealer franchise agreement, a standard contract that TMS required NET to sign with all its dealers.

■ *Bogosian* emphasized that coercion has no relevance to a determination of anti-

trust liability; it is relevant, if at all, only to determining whether a tie-in exists, that is, whether the seller has conditioned the sale of one product on the purchase of another. Once a tie is established, liability follows if the other two elements of the *per se* rule—power in the tying product market and foreclosure of a not insubstantial amount of interstate commerce in the tied product—are satisfied. Neither of these two elements incorporates a coercion requirement. *See, Fortner Enterprises v. U.S. Steel (Fortner I)*, 1969, 394 U.S. 495, 499–500, 89 S.Ct. 1252, 22 L.Ed.2d 495; *United States v. Loew's Inc.*, 1962, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11; *Northern Pac. R. Co. v. United States*, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545. In *United States v. Loew's, supra*, for example, the Court noted that "the requisite economic power may be found on the basis of either uniqueness or consumer appeal, . . ." 371 U.S. at 45 n. 4, 83 S.Ct. at 102. Such an inference does not permit an inquiry into individual coercion.

The Supreme Court's *per se* test is designed to eliminate detailed evidentiary inquiries of the type that would be required to prove individual buyer coercion. The advisability of this mechanical rule-oriented approach rests · on the Supreme Court's judgment—right or wrong—that tying arrangements offer the consumer little benefit and much potential harm. It is the nature of the test that it focusses not on the buyer's state of mind but rather on the seller's actions; tying doctrine seeks to deter a seller's conduct in unnecessarily conditioning the sale of one product on the purchase of another. *Bogosian, supra*, at 450. *See generally*, A. D. Austin, *The Individual Coercion Doctrine in Tie-In Analysis: Confusing and Irrelevant*, 65 Calif.L.Rev. 1143 (1977).

■ Coercion may have some relevance for proving the tie in some situations, but in a case like the instant one in which the tie is manifest in the express terms of a standard form contract, independent proof of individual coercion is entirely unnecessary. This appears to be the approach of a major-

ity of courts. *See, e. g., Bogosian, supra; Moore v. Jas. H. Matthews & Co.,* 9 Cir. 1977, 550 F.2d 1207, 1216–17; *Hill v. A–T–O, Inc.,* 2 Cir. 1976, 535 F.2d 1349, 1355; *Schuler v. Better Equip. Launder Center, Inc.,* D.Mass.1977, 74 F.R.D. 85, 87; *AAMCO Automatic Transmissions, Inc. v. Tayloe,* E.D.Pa.1976, 407 F.Supp. 430, 434–35; *Thompson v. T. F. I. Companies, Inc.,* N.D. Ill.1974, 64 F.R.D. 140, 146; *Abercrombie v. Lum's, Inc.,* S.D.Fla.1972, 345 F.Supp. 387, 390. *But see, Hehir v. Shell Oil Co.,* D.Mass.1976, 72 F.R.D. 18, 21–22.[8]

## II. *Additional Requirements*

Plaintiffs have succeeded in demonstrating a probability of success on the merits. In order to prevail on their motions, however, plaintiffs must also show that they will probably prove damages in excess of the amount of the property they seek to encumber. Moreover, in order to obtain a preliminary injunction, plaintiffs must offer a bond in an amount sufficient to protect the defendants from their losses should this court's ruling be reversed on appeal.

### A. *Damages in Excess of Attachment*

Plaintiffs calculate their probable damages according to a formula that converts the difference between NET's delivery charge before the TMS take-over and TMS's delivery charge after the take-over into a percentage of the NET delivery charge. This percentage, plaintiffs contend, represents the rate of NET overcharge for each automobile. They then apply the percentage to each of the NET delivery prices over various periods of NET distributorship and arrive at a grand total by multiplying the resulting figures by total cars sold during the corresponding periods and summing over time. After trebling, this total, according to plaintiffs' calculations, is more than twelve million dollars, an amount greatly exceeding the amount of their attachment, two million dollars of real property and five million dollars of assets.[9]

Plaintiffs' damage formula, in our opinion at this stage of the proceedings, is a reasonable one, especially in light of the liberal standards controlling proof of damages in private antitrust actions. *See, Haverhill Gazette Company v. Union Leader Corporation,* 1 Cir. 1964, 333 F.2d 798, 804–807. Defendants' principal argument in opposition to the use of this method is that it fails to take into account the larger profit TMS enjoys from the sale of each car. As we noted at an earlier point in this opinion, we are unable to comprehend why TMS would absorb part of its delivery cost when it could charge the dealers the full amount.

We are satisfied that plaintiffs have established a reasonable likelihood that they will recover damages in excess of the amount of their attachment. We therefore

8. Even if proof of individual coercion were an element of a tying violation, it appears from an examination of the affidavit evidence that there is a reasonable likelihood that plaintiffs would prevail on this issue. Only in 1972 did NET switch from hiring independent common carriers to using its own transportation facilities. Dealers who voluntarily accepted centralized delivery with the use of independent contractors could not also be deemed to have agreed to delivery by NET itself. The switch-over appears to have been a unilateral NET decision pursuant to the general terms of the standard dealer franchise agreement reserving the seller's right to control delivery. Dealers were not allowed to negotiate this new arrangement; they could either accept it or risk termination of their franchise. *See, Toyota Dealer Sales and Service Agreement,* Article XIII, ¶ B(3) (most recent agreement) (Pltff's Ex. 1 to 5/10/76 Anderson Dep). Considering the large investment of each dealer in his ongoing business and the fact that no dealer could purchase Toyotas from another distributor, the latter alternative was hardly a realistic one. NET, therefore, exercised its power in the tying product market, its economically powerful position vis a vis its dealers, to coerce compliance with the new delivery system. *Cf., F. T. C. v. Texaco,* 1968, 393 U.S. 223, 226–29, 89 S.Ct. 429, 21 L.Ed.2d 394.

9. We have considered the results of the informal survey conducted by Ronald A. Joseph, President of NET, in December 1976, just prior to commencement of this litigation. 1/6/77 Affidavit of R. A. Joseph. The survey purports to indicate that 22 of 75 dealers did not object to the NET delivery scheme. We attach little weight to this highly informal, self-serving study.

approve the attachment in the amount of seven million dollars. However, we are unable at this time to determine the value of the property encumbered by plaintiffs' motion for a preliminary injunction. In a contemporaneous procedural order we are calling for a stipulation of the parties or affidavits bearing on this remaining question.

### B. *Posting of Security*

■ Plaintiffs must post a bond sufficient to hold the defendants harmless if it turns out that the preliminary injunction was erroneously granted; setting the precise amount of the bond lies within the discretion of the issuing court. Fed.R. Civ.P., Rule 65(c); *N. E. Airlines v. Nationwide Charters & Conventions, Inc.,* 1 Cir. 1969, 413 F.2d 335, 338; *Continental Oil Company v. Frontier Refining Company,* 10 Cir. 1964, 338 F.2d 780, 782–83. Unlike *Continental Oil Company,* on which plaintiffs rely in support of their contention that a bond is not required, there is no evidence in the instant case that plaintiffs have sufficient assets to respond in damages if either of the defendants is injured by reason of the wrongful issuance of this injunction.

Due to the absence of any estimates relating to the value of the stock and assets involved in this motion and damages which might result from the contemplated restraint on their alienation during the pendency of these proceedings, we are unable to determine a proper amount for the bond. Therefore, in the contemporaneous procedural order mentioned above, we are also calling, conditionally, for briefs on the issue of the amount of security which should be required and evidence of the total value of the stock and assets referred to in plaintiffs' motion under Fed.R.Civ.P., Rule 64.